MALCOLM LEADER-PICONE *(State Bar No. 104620)*
KAIPOLANI K.B. YOUNG *(State Bar No. 164718)*
JAMES J. KIM *(State Bar No. 101809)*
1970 BROADWAY, SUITE 1030
OAKLAND, CA  94612
TELEPHONE:    510-444-0709
FACSIMILE:     510-444-1291
EMAIL:        mlp@leader-picone.com
              jkim@roklaw.com

Attorneys for Plaintiff
INDONG ADVANCED MATERIALS, INC.

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INDONG ADVANCED MATERIALS, INC. )<br><br>     Plaintiff,     )<br>          )<br>vs.          )<br>          )<br>GREEN ENERGY GLOBAL, INC., an )<br>Arizona corporation; GEC EXPLORATION, )<br>INC., a Delaware corporation; DONALD )<br>DEMERY as Trustee of QUANTUM )<br>TRUST, a Connecticut Statutory Trust; )<br>MUHAMMED KHAN, an individual, )<br>VICTORIA CHOI, aka CHONG IN SHIM, )<br>an individual, LUCIA KIM aka LUCIA JEE, )<br>an individual,  ROLLIE PETERSON, an )<br>individual, TAE JOON YI, an individual, )<br>KWON DO KANG, an individual, BAE, )<br>KIM & LEE, LLC., a professional law )<br>corporation, and DOES ONE through )<br>TWENTY, inclusive,     )<br>          )<br>     Defendants.     ) | Case No.<br><br>**COMPLAINT OF INDONG ADVANCED MATERIALS, INC. FOR:**<br>  **1. BREACH OF CONTRACT;**<br>  **2. FRAUD;**<br>  **3. UNJUST ENRICHMENT;**<br>  **4. PROFESSIONAL NEGLIGENCE; and**<br>  **5. DECLARATORY RELIEF.**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

          COMES NOW plaintiff INDONG ADVANCED MATERIALS, INC. who alleges and makes claims for relief, as follows:

**COMPLAINT**

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) as an action where the matter in controversy exceeds $50,000, exclusive of interest and costs, and is between citizens of California and citizens or subjects of a foreign state.

2.     Some of the transactions, matters and occurrences hereinafter alleged occurred entirely or in part in the Eastern District of California, and one of the parties' agreements designates Sacramento as the forum for any disputes, rendering this Court the proper venue for this action.

## PARTIES

3.     Plaintiff INDONG ADVANCED MATERIALS, INC. ("INDONG") is a corporation existing under the laws of the Republic of Korea,, founded in 1971, with its principal place of business in Seoul, Republic of Korea. INDONG is a leading manufacturer of displays (e.g. monitors, screens, etc), used by some of the world's famous brands, including Samsung.

4.     Defendant GREEN ENERGY GLOBAL, INC. ("GEGI"), is a corporation incorporated in Arizona, which held itself out to INDONG as an expert in the lithium industry, including in the business of Fund Raising and Financial Management, Manufacturing, Distribution/Logistics, Sales, Marketing, Corporate Governance, Strategic Planning and Execution in the lithium industry. It also represented to INDONG and touted itself as the owner of two (2) mining claims in Uyuni, Bolivia, that would permit the mining of 1.25 million metric tons of lithium.

5.     Defendant GEC EXPLORATIONS, INC. is a Delaware corporation, which held itself out as having extensive experience in the execution of integral solutions for construction and start-up of lithium industrialization. It touted that it had "certain lucrative arrangements" with various Bolivian government agencies  "to mine, extract and sell lithium owned by Bolivian State."

6.     Defendant MUHAMMED KHAN ("KHAN") was and is the Chief Executive Officer of GEGI and was involved in the negotiation of the contract and agreement that are subject of this lawsuit.

**COMPLAINT**

-2-

7.     Plaintiff is informed and believes and thereon alleges that defendant VICTORIA CHOI, aka CHONG IN SHIM ("CHOI"), is an officer, shareholder and director of GEGI and participated in most of the meetings between the parties that are the subject of this lawsuit.

8.     Defendant LUCIA KIM aka LUCIA JEE ("JEE") is the person who made initial outreach to INDONG about the lithium project that is the subject of this lawsuit, and she is believed to have acted as an agent for GEGI. Plaintiff is informed and believes and thereon alleges that JEE has some sort of ownership interest in GEGI.

9.     Defendant ROLLIE PETERSON ("PETERSON") is a California attorney with his office in Rancho Cordova, Sacramento County, California. Plaintiff is informed and believes and thereon alleges that PETERSON's role in the transactions and occurrences herein alleged went beyond the role of a mere attorney to GEGI and GEC and KHAN and PETERSON was a co-conspirator and one of the principal actors in perpetrating the fraud that is at the heart of this lawsuit.

10.    Defendant KWON DO KANG ("KANG") is a Korean national, employed by BKL Law Corporation, in Seoul, Korea. He held himself out to INDONG as being a member of the Virginia Bar, and purported to represent INDONG in all matters leading up to and following the execution of the Mining License Agreement which is the subject of this lawsuit.

11.    Defendant BAE, KIM & LEE, LLC ("BKL") is a one of the largest law firms in Korea, and employed Kang during all relevant times. BKL issued an invoice to INDONG for the services Kang and others purportedly rendered for the benefit of INDONG in this matter.

12.    Defendant TAE JOON YI ("YI") was a board member of INDONG at the time purported agreements were entered into. Plaintiff is informed and believes and thereon alleges that defendants YI and KANG acquired interests in a joint venture associated with the lithium project, thereby engaging in self-dealing and breaches of fiduciary duty towards INDONG.

13.    Yacimeintos de Litios Bolivianos ("YLB") is not a named party, but is an important entity vis-à-vis the transactions and occurrences alleged herein. YLB is the Bolivian government agency in charge of mining activities in Bolivia, including the issuance of licenses for mining of Lithium in Uyuni, Bolivia. With great international fanfare in January 2023, YLB awarded

**COMPLAINT**

the Lithium mining rights that are the subject of this lawsuit to a Chinese consortium. Per YLB's press releases concerning the awarding of Lithium mining rights, defendants GEGI and GEG were not even considered among the seven finalists for the award of the Lithium mining rights.

14.     Defendant DONALD DEMERY sued herein as the Trustee of QUANTUM TRUST ("QUANTUM") which plaintiff is informed and believes is a statutory trust under the laws of the state of Connecticut. QUANTUM purports to be the assignee of GEC, per Amendment and Substitution of Parties Agreement.

15.     Plaintiff is unaware of the true names and capacities of the defendants sued herein as Does One through Twenty, inclusive, and therefore sues such defendants by such fictitious names.  Plaintiff will seek leave of court to amend this complaint when the true names and capacities of these defendants have been ascertained.

16.     Plaintiff is informed and believes and thereon alleges that, at all relevant times, each of the defendants, including those identified herein as Does One through Twenty, inclusive, was the servant, employee, principal, partner, joint venturer, co-conspirator and/or agent of each and every other defendant and, that in doing the acts alleged herein, each defendant was acting within the course and scope and authority of such employment, servitude, partnership, joint venture, conspiracy and/or agency, with the full knowledge, consent and/or ratification of each and every other defendant.

## GENERAL ALLEGATIONS

17.     During May 2022, JEE approached INDONG about a lithium mining project in Bolivia.

18.     After a series of meetings between them INDONG, GEGI and GEC executed a Mining License Agreement ("MLA") on July 27, 2022,. A true and correct copy is attached hereto as Exhibit "A" and incorporated by this reference.

19.     In order to induce INDONG to enter into the MLA and related agreements, GEGI and GEG, through KHAN, JEE and PETERSON represented to INDONG that GEGI was the owner of two (2) mining claims in Uyuni, Bolivia. The MLA expressly states that "GEGI is to be the owner of, and in possession of two certain, unpatented mining claims situated in the Municipality of

Solar de Uyuni, Bolivia, described in Exhibit "A" attached to, and by this reference, and subject to the entry of the Mining Lease Agreement, a memorandum of which will be attached to this Agreement". To this day, neither GEGI nor its counsel PETERSON has produced documentation of the two mining claims; and the two mining claims were never attached to the MLA as an exhibit.

20.     The business plan between the parties called for GEGI to assign or license its mining rights to INDONG, form a joint venture company in Bolivia with GEGI and INDONG as its members. Without verification of the legitimacy of GEGI's claim to own lithium mining rights from the Bolivian government, INDONG could not proceed with the project because the Korean government would not approve the project without such confirmation.

21.     Subsequently, on August 2, 2022, GEGI, QUANTUM TRUST, YLB and Los Universidad Mayor de San Simon, a university in Cochabamba, Bolivia purported to execute and enter into an "Acuerdo de Empresa Conjunta Minera" (Mining Joint Venture Agreement) ("ACUERDO"). Defendants presented the ACUERDO to INDONG as purported confirmation that GEGI did have rights to mine lithium in Bolivia. A true and correct copy of the ACUERDO is attached hereto as Exhibit "B". Muhammed Khan provided the ACUERDO to INDONG in late August 2022 as purported evidence that he and his companies did have legitimate mining claims.

22.     On August 7, 2022, in compliance with section 5.2 of the MLA, INDONG executed a promissory note in favor of GEGI in the amount of One Hundred Million Dollars ($100,000,000). That promissory note specified Sacramento, California as the venue for any disputes arising out of the Note. A true and correct copy of the promissory note is attached hereto as Exhibit "C". At the same time, INDONG's President, SUNG WOON YOO, executed a SECURITY AND PLEDGE AGREEMENT, GUARANTY OF SUNG WOON YOO, and SHAREHOLDER VOTING AGREEMENT, by which Mr. Yoo guaranteed the debt and pledged $100,000,000 in personally owned stocks in INDONG and subsidiaries as security for the promissory note.

23.     Then, on August 8, 2022, defendants began to change the terms of the MLA, by having INDONG execute an Amendment and Substitution of Parties to the Mining Licensing Agreement. A true and correct copy of that Agreement is attached hereto as Exhibit "D" and

**COMPLAINT**

incorporated by this reference. The Amendment purported to correct an error in the MLA as to the division of Net Revenues as between GEGI and GEC, while also assigning GEC's interest in the MLA to QUANTUM TRUST.

24.     Subsequently, by a second addendum to the MLA, GEGI changed the terms of the MLA so that the so-called "Finders Fee" totaling Ten Million Dollars ($10,000,000) would not be paid into PETERSON's attorney-client trust account but, instead, $2 million would be deposited directly to GEGI's account at Wells Fargo Bank in San Francisco, California; with another $8 million to be sent to PETERSON's law firm account at U.S.Bank. A true and correct copy of the Second Addendum is attached hereto as Exhibit "E".

25.     Thereafter, in reasonable reliance upon defendants' repeated representations that they possessed lithium mining rights in Bolivia, INDONG wired a total sum of $10 million to GEGI, with $2 million wired to GEGI's account at Wells Fargo Bank in San Francisco, California on August 8, 2022 and another $8 million wire to PETERSON's trust account on September 8, 2022.

26.     In late November 2022, defendant KHAN came to Seoul, Korea and held a news conference. At the news conference, KHAN announced that GEGI had two mining claims in Uyuni, Bolivia, just as he and CHOI and PETERSON had represented in order to induce the execution of the MLA.

27.     Just a day after defendant KHAN held his press conference, YLB issued an official statement, refuting defendant Khan's claim. In a press release, a true and correct copy of which is attached hereto as Exhibit "F", YLB stated (as directly translated):

> Yacimientos de Litio Bolivianos (YLB) clarifies for public opinion that, as a strategic State enterprise, it does not have signed agreements granting rights of lithium extraction in the Bolivian salt flats with any foreign company.

> The version that indicates that a Korean-American business consortium won rights to extract lithium in Bolivia to acquire nine million tons of metal in the Salar de Uyuni is false and lacks a reliable source.

28.     This YLB press release caused serious turmoil for INDONG.

29.     Despite INDONG having fully performed its obligations under the MLA, defendants have failed to provide confirmation that INDONG is a member of joint venture company

**COMPLAINT**

established in Bolivia. It has now been more than seven months since the MLA was executed, and more than five months since INDONG paid $10 million to GEGI.

30.     So, while it seems clear that defendants' representations about mining claims were false, defendants continue to deny any wrongdoing. And despite numerous requests from INDONG for defendants' rebuttal to YLB's public repudiation of their claim of mining licenses, defendants have yet to provide any reasonable explanation.

31.     After some time passed without any confirmation of mining claim ownership from any of the defendants, and without confirmation of formation of the joint venture entity, INDONG initiated an investigation in late December 2022, by retaining a Bolivian attorney to investigate and interview the parties in Bolivia with knowledge of the transactions and occurrences to date.

32.     INDONG's investigation concluded that:

    a)     Neither GEGI, GEG nor QUANTUM TRUST own any mining rights in Uyuni, Bolivia, or anywhere else in Bolivia;

    b)     The purported signature on the ACUERDO of Dr. Marcelo Gabio Gonzales Saique, the purported General Manager of YLB, was not authentic and was affixed to the ACUERDO without the knowledge or consent of Dr. Saique.

    c)     At the time of his purported execution of the ACUERDO, Dr. Saique was not longer the General Manager of YLB, since his term had ended on August 21, 2021. That is according to the official information at YLB and confirmed by INDONG's Bolivian counsel.

33.     Defendants' representations were false, and furthermore, the purported document intended to show defendants' legitimacy (the ACUERDO) was a complete fabrication, totally fake, and void *ab initio*.

34.     Subsequently, in January 2023, the President of Bolivia, following the approval of the licensing by YLB, announced that Bolivia had awarded mining rights and mining project to a Chinese consortium, CATL. https://www.reuters.com/technology/bolivia-taps-chinese-battery-giant-catl-help-develop-lithium-riches-2023-01-20/

**COMPLAINT**

35.     Inexplicably, defendants continue to claim that they are not in breach of the MLA and have mining rights as claimed.

## FIRST CLAIM FOR RELIEF
(Breach of Contract/Failure of Consideration)

36.     By this reference, plaintiff incorporates and realleges, as though fully set forth, the allegations of paragraphs 1 through 35, inclusive.

37.     By the terms of the MLA, GEGI and/or GEC were to assign or license two (2) mining rights to INDONG. Defendants have failed and have refused to make the necessary transfer. In fact, defendants have failed and refused to provide proof that they own the requisite mining rights.

38.     In addition, defendants were to set up a joint venture company in Bolivia, naming INDONG as a member of the joint venture company. Defendants have failed and have refused to make to provide proof that they have established the requisite Bolivian joint venture.

39.     The lithium mining licenses and the membership in the Bolivian joint venture were valuable consideration that GEGI and GEC and QUANTUM TRUST owed to INDONG in consideration for GEGI having received from INDONG the sum of $10 million and the promissory note for $100 million, and Mr. Yoo's guarantee and security interests.

40.     Defendants have failed and have refused to provide the agreed license assignments and has failed to form the requisite joint venture company.

41.     Despite demand, defendants have failed and refused to return INDONG's $10 million and failed and refused to cancel the promissory note and guarantee.

42.     Defendants' breaches have caused damages to INDONG according to proof, but in a sum not less than $40 million.

43.     As a proximate result of defendants' breaches of contract, plaintiff suffered actual injury when it signed the promissory note, had its President sign the guarantee and security agreements, and when it parted with $10 million.

44.     Plaintiff has suffered damages and losses and is entitled to the benefit of its bargain, in an amount in excess of $40 million, according to proof at trial.

**SECOND CLAIM FOR RELIEF**
(Intentional Misrepresentation)

45.     By this reference, plaintiff incorporates and realleges, as though fully set forth, the allegations of paragraphs 1 through 44, inclusive.

46.     When defendants represented to INDONG that they were the owners of two valid and legitimate licenses to mine 900,000 metric tons of lithium from the Salar de Uyuni in Bolivia, they knew that such representations were false; and INDONG did not know they were false.

47.     INDONG reasonably relied upon defendants' representations and, in such reliance, executed the MLA, the Amendment and Substitution of Parties, the Second Addendum, the Promissory Note, had its President sign the guarantee and related security documents, transmitted $10,000,000 to GEGI Wells Fargo Bank account in San Francisco, publicly announced its purported purchase of lithium mining rights, all to its extreme detriment and loss.

48.     As a proximate result of defendants' false representations and forged ACUERDO, plaintiff has suffered actual injury when it executed the MLA, the Amendment and Substitution of Parties, the Second Addendum, the Promissory Note, had its President sign the guarantee and related security documents, transmitted $10,000,000 to GEGI Wells Fargo Bank account in San Francisco, publicly announced its purported purchase of lithium mining rights.

49.     Plaintiff has suffered damages and losses and is entitled to the benefit of its bargain, in an amount in excess of $40 million, according to proof at trial.

50.     Because defendants' conduct as alleged herein was fraudulent and malicious under California Civil Code section 3294, plaintiff may recover damages, in addition to its actual damages, for the sake of example and by way of punishing the defendants, in an amount according to proof at trial.

**THIRD CLAIM FOR RELIEF**
(Unjust Enrichment)

51.     By this reference, plaintiff incorporates and realleges, as though fully set forth, the allegations of paragraphs 1 through 50, inclusive.

**COMPLAINT**

52.     In addition to $10 million that GEGI obtained from INDONG by means of its fraudulent misrepresentations and forged ACUERDO, each one of the defendants have un justly enriched him or her or itself at the expense of INDONG and INDONG's reputation.

53.     KANG, BKL and YI have all profited through legal fees and a joint venture at the expense of INDONG, when they should have protected INDONG from this fraud. They all failed to do the most elemental due diligence to ensure that INDONG would not be defrauded, in breach of their fiduciary duties to INDONG.

54.     KHAN, CHOI, JEE and PETERSON have all undoubtedly enriched themselves at INDONG's expense from their fraudulent scheme.

55.     GEGI and GEC and QUANTUM are likewise unjustly enriched.

56.     As a proximate result of defendants' wrongful conduct as alleged herein, plaintiff has suffered actual injury when it executed the MLA, the Amendment and Substitution of Parties, the Second Addendum, the Promissory Note, had its President sign the guarantee and related security documents, transmitted $10,000,000 to GEGI Wells Fargo Bank account in San Francisco, publicly announced its purported purchase of lithium mining rights.

57.     Retention of their ill-gotten gains at INDONG's expense would constitute unjust enrichment. Plaintiff seeks orders disgorging the defendants' ill-gotten gains in an amount to be determined at trial, but no less than $40 million according to proof.

58.     Because defendants' conduct as alleged herein was fraudulent and malicious under California Civil Code section 3294, plaintiff may recover damages, in addition to its actual damages, for the sake of example and by way of punishing the defendants, in an amount according to proof at trial.

### FOURTH CLAIM FOR RELIEF
(Professional Negligence of KANG and BKL)

59.     By this reference, plaintiff incorporates and realleges, as though fully set forth, the allegations of paragraphs 1 through 58, inclusive.

**COMPLAINT**

60.     At all relevant times, KANG was an officer of EuroCell an affiliated company of INDONG. From the beginning of this lithium mining project, he represented INDONG together with another attorney at BKL. While there was no formal written fee agreement between INDONG and KANG/BKL, BKL invoiced INDONG for services that KANG rendered in the mining project.

61.     KANG took the primary responsibility for drafting and negotiating the MLA with his counterpart PETERSON, attorney for GEGI, GEC and KHAN.

62.     INDONG trusted and relied on KANG's expertise and that of BKL, in particular INDONG relied upon KANG's educational background in the United States, as well as his command of English. Also, KANG represented that he was licensed to practice law in the State of Virginia, which plaintiff has been unable to verify.

63.     Prior to the execution of the MLA, defendant KANG had raised certain concerns with PETERSON. However, KANG counseled INDONG to proceed with the MLA and the lithium mining project, even though KANG failed to resolved the concerns over the absence of documentation of mining rights that he had expressed to PETERSON.

64.     KANG and BKL failed to conduct the level and extent of due diligence of a reasonable attorney to ascertain whether GEGI had indeed mining claims as represented by GEGI.

65.     Rather than pausing the transaction over his legal concerns, KANG facilitated the wire of $2 million to GEGI's Wells Fargo Bank account, taking an active part in persuading INDONG's bank to wire the money to GEGI's account instead of the PETERSON trust account specified in the MLA.

66.     Contrary to a denial he made to INDONG, KANG received the ACUERDO document in late August 2022. However, as with the MLA and the representation that GEGI possessed legitimate lithium mining rights, KANG failed to conduct any due diligence as to the substance of the ACUERDO or its authenticity. Accepting the ACUERDO at face value, KANG instructed INDONG to wire $8 million to GEGI's Wells Fargo Bank account.

67.     Plaintiff is informed and believes and thereon alleges that KANG went to Uyuni, Bolivia and made a site visit to the Salar de Uyuni. While there, he established a corporation,

**COMPLAINT**

purportedly to have INDONG as a joint venture member with GEGI. He knew that the founding of a joint venture was necessary for INDONG to submit application for license to engage in an overseas mining project. However, instead of having INDONG as the shareholder, he became the owner of 0.4% of interest in the joint venture company, enriching himself while breaching his fiduciary duties to INDONG.

68.     But for KANG's professional negligence, which is imputed to his employer, BKL, INDONG would not have executed the MLA and other agreements nor would it have parted with $10 million and signed a promissory note to pay GEGI $100,000,000 as it did.

69.     As a proximate result of the professional negligence of BKL and KANG, plaintiff has suffered actual injury when it executed the MLA, the Amendment and Substitution of Parties, the Second Addendum, the Promissory Note, had its President sign the guarantee and related security documents, transmitted $10,000,000 to GEGI Wells Fargo Bank account in San Francisco, publicly announced its purported purchase of lithium mining rights.

70.     Plaintiff has suffered damages and losses as a proximate result of KANG and BKL's conduct, in an amount in excess of $40 million, according to proof at trial.

## FIFTH CLAIM FOR RELIEF
(Declaratory Relief)

71.     By this reference, plaintiff incorporates and realleges, as though fully set forth, the allegations of paragraphs 1 through 70, inclusive.

72.     An actual controversy exists between plaintiff and defendants. Plaintiff seeks a declaration of the Court declaring that the MLA, the Amendment and Substitution of Parties, the Second Addendum, the Promissory Note, and the guarantee and related security documents are all null and void *ab initio* due to the fraud in their inducement.

## DEMAND FOR JURY TRIAL

73.     Plaintiff reserves its right to a jury trial of its claims, as applicable.

/ / / /

**COMPLAINT**

1

2
             **WHEREFORE**, plaintiff demands relief against defendants on each claim for relief, as

follows:

3
           1.       For general and compensatory damages of not less than $40 million, according

4
to proof;

5
           2.       For exemplary and punitive damages, according to proof;

6
           3.       For attorney's fees and costs incurred in this action, according to proof;

7
           4.       For costs of suit herein; and,

8
           5.       For such other and further relief as the Court deems just and proper.

9
DATED:  March 7, 2023.          LEADER-PICONE, YOUNG AND KIM

10

11
          BY:_____

12
            MALCOLM LEADER-PICONE
            Attorneys for Plaintiff

13
            INDONG ADVANCED MATERIALS, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**

# EXHIBIT "A"

## MINING LICENCING AGREEMENT

This Mining Licensing Agreement ("Agreement") is made and entered into this _____ day of July, 2022, by and between Green Energy Global Inc., an Arizona corporation ("GEGI"), found at 901 N. Haskell Ave. Willcox, AZ 85643, GEC Explorations Inc., a Delaware corporation, found at 2448 East 81st Street, Suite 445, Tulsa, Oklahoma 74137, ("GEC") and Indong Advanced Materials, Inc., a Republic of Korea corporation, ("Indong") found at 54 Gajangsaneopseo-ro, Osan-si, Gyeonggi-do, Korea.

### RECITALS

**WHEREAS,** Indong is in the business of Development and Manufacturing of, among other things, Heat Sink Sheets, and graphite anode materials for secondary batteries, and Next-Generation Rechargeable Batteries;

**WHEREAS,** GEC is a company with extensive experience in the execution of integral solutions for the construction and start-up of Lithium Industrialization Projects, with experience and business capabilities to achieve financial solutions for carrying out projects in the energy area, and providing the work plan that includes the integral solution of the construction of the Lithium Industrial Project;

**WHEREAS,** Yacimiento De Litio Bolivianos ("YLB") is a Bolivia National Strategic Public Company ("EPNE"), with a national presence in all Lithium industrial activities, its main objective and strategic role being participation in the entire production chain, as well as in the import, and export activities;

**WHEREAS,** GEGI is in the business of Fund Raising and Financial Management, Manufacturing, Distribution / Logistics, Sales, Marketing, Corporate Governance, Strategic Planning and Execution;

**WHEREAS,** Licensor has a certain lucrative arrangement with the Ministry of Hydrocarbons and Energies of the Plurinational State of Bolivia, ("MHE") in whose structure is the Vice-Ministry of High Energy Technologies ("VMATE") (Lithium, Nuclear Energy), and YLB to mine, extract, market and sell Lithium owned by the Bolivian State ("Lithium Mines");

**WHEREAS,** GEGI is to be the owner of, and in possession of two certain, unpatented mining claims situated in the Municipality of Solar de Uyuni, Boliva, described in Exhibit "A" attached to, and by this reference, and subject to the entry of the Mining Lease Agreement, a memorandum of which will be attached to this Agreement;

**WHEREAS,** Licensee desires to licence from Licensor the right to enter certain lands, defined herein, to mine, extract, market and sell Lithium owned by the Bolivian State; and

**WHEREAS,** Licensor, in preparation of entering a "Mining License Agreement" with Licensee, anticipates the expenditure of substantial sums of monies, and time, and thus require of Licensee the

MLicA.02.KHG.K22.wpd                    Page 1 of 21




payment of monies under the terms and conditions set forth in this Agreement.

**NOW THEREFORE**, in consideration of the mutual promises set forth in this Agreement, Licensor and Licensee, agree as follows:

1.      **Definitions**: The following defined terms, wherever used in this Agreement, shall have the meanings described below:

    1.1      *"Business Day"* shall mean the week days, but excluding all holidays that are recognized by the Plurinational State of Bolivia.

    1.2      *"Continuously Work"* shall mean the uninterrupted activities necessary to developing, and the mining of Minerals, without failure, excepting those periods of not more then 30 continuous working Days, in any License Year, and Force Majeure period, as hereafter defined.

    1.3      *"Effective Date"* shall mean the date first written above.

    1.4      *"Force Majeure"* shall mean an extraordinary event that is beyond the reasonable control of a party, and that shall directly prevent one or more parties from performing, to include war, strike, riot, and pandemic, but excluding the negligence or malfeasance of a party.

    1.5      *"Gross Revenue"* shall mean that revenue derived from sources set forth in Exhibit "B", and before any expense, or taxes, computed according to generally accepted accounting principles ("GAAP"), as formulated by the American Institute of Certified Public Accountants.

    1.6      *"Licensee"* shall mean Indong.

    1.7      *"Licensor"* shall mean GEC.

    1.8      *"License Year"* shall mean each one (1) year period following the Effective Date, and each anniversary of the Effective Date.

    1.9      *"Minerals"* shall mean Lithium Carbonate, whether known to exist, or discovered, or mined on the site specified in this Agreement, after the Effective Date.

    1.10      *"Mining Claim"* shall mean the parcels of land for which the Licensee has asserted a non exclusive right of possession, and the right to develop, and extract a discovered, valuable, mineral deposit.

    1.11      *"Net Proceeds"* shall mean the net proceeds calculation as provided for in Exhibit "B" of this Agreement, attached hereto and incorporated herein by this reference.

    1.12      *"Ore"* shall mean Lithium carbonate, and materials from the Property, the nature and

MLicA.02.KHG.K22.wpd              Page 2 of 21

composition of which, in the sole judgment of Licensee justifies either (a) mining, or removing from place, and shipping and selling the same, or delivering the same to a processing plant for physical or chemical treatment; or (b) leaching in place.

     **1.13** *"Product"* shall mean: (a) all Ore shipped and sold; and (b) all concentrates, precipitates and products, and by-products by or for Licensee from Ore.

     **1.14** *"Property"* shall mean the Unpatented Mining Claims described in Exhibit "A" of this Agreement, which will be determined by the Parties for the extraction of 900,000 metric tons of Lithium.

     **1.15** *"Royalty Payment"* shall mean a payment based on the gross sales amount received by the Licensee.

     **1.16** *"Unpatented Mining Claims"* means those mining claims in which the government holds title to the underlying land.

     **1.17** *"Waste"* shall mean earth, rock, or material mined, or removed from the Property, and chemicals used for extraction during the term of this Agreement, but which is not Ore.

## 2.    Grant of Exploration Privileges. Uses and Water Rights:

     **2.1** *Property Subject to Agreement.* The real property subject to this Agreement shall be that portion of land found in the department of Potosí, in the Plurinatinal State of Bolivia, Municipality of UYUNI, having nine hundred thousand (900,000) metric tons of Lithium, as determined by a geographic subsurface survey, and thereafter mapped in a surface survey, depicted by metes and bounds. Licensees shall immediately, after signing the full and complete Mining License Agreement, cause said surveys to occur, and pay for the same.

     **2.2** *Grant of Exploration Privilege*: Subject to the terms and conditions of this Agreement and to the extent permitted by applicable Bolivian, MHE, VMATE, YLB, the Department of Potosi and the Municipality of Uyuni's laws, regulations, and ordinances, Licensor grants to Licensee the exclusive right, and privilege, to enter on the Property, for the purposes of exploration and prospecting for minerals, mineral substances, metals, ore-bearing minerals, and rocks, of every kind, including the right of ingress, and egress, for personnel, machinery, equipment, supplies and products, and the right to use so much of the surface, and water located thereon, and thereunder, as may be reasonably needed for such purposes.

     **2.3** *License*: Subject to the terms and conditions of this Agreement, and to the extent permitted by applicable Bolivian MHE, VMATE, YLB, and Department of Potosi, Municipality of Uyuni, and other local laws, regulations and ordinances, Licensor licenses, exclusively to Licensee, the Property for the purposes of development, production, removal, and sale of all mineral substances, metals, ore-bearing materials, and rocks of every kind. The rights subject to this

MLicA.02.KHG.K22.wpd      Page 3 of 21

Agreement, include all the rights, title, and interests of Licensor in the Property, and mining claims described in this Agreement, including, but not limited to, the surface and subsurface, all Ores, Minerals, mineral elements, compounds and mineral rights, all water, arid water rights, geothermal resources and geothermal water in, upon and under the Property, all of the interests of Licensor in all options, contracts easements and rights of way reserved or granted in, upon or pertaining to the Property, and all rights, title and interests which may be acquired by or for Licensor in or pertaining to the Property or any part, during the term of this Agreement, along with any and all veins, ores and mineral deposits now owned or acquired by Licensor after the Effective Date, extending from or into or contained in the Property, and all tenements, hereditaments and appurtenances.

    **2.4**    *Uses*: Licensee is granted the right, insofar as Licensor may lawfully grant the right, to use the Property, including, but without being limited to the full right, authority, and privilege of placing and using excavations, open pit mines, injection and production wells, openings, shafts, ditches, and drains, and of constructing, erecting, maintaining, using, and at its election, removing any, and all buildings, structures, plants, roadways, pumps, pipelines, electrical power lines and facilities, stockpiles, waste piles, heap leach pads, tailings, ponds, and facilities, settling ponds, and all other improvements, property, and fixtures for mining, removing beneficiating, concentrating, smelting, extracting, leaching (in place or otherwise), refining and shipping of Ores, Minerals or Product, or for any incidental activities, whether presently contemplated or known to be used in the mining, extraction, production, or processing of Minerals, water, or geothermal resources, or energy resources, or to any of the rights or privileges of Licensee hereunder. Licensee is further granted the right, insofar as Licensor may lawfully grant the right, to divert streams, to remove lateral and subjacent supports, to use, cave, subside, consume, or destroy the surface, or any part thereof, to deposit earth, rocks, waste, lean Ore and materials on any part of the Property, to leach the same, and to commit waste.

    **2.5**    *Water Rights*: Licensor licenses to Licensee all of Licensor's water rights appurtenant to the Property, subject to the regulations of the Salar de Uyuni municipality, in which the Property is situated, concerning the appropriation and taking of water. Licensee shall have the right to appropriate, and use water to drill wells for the water on the Property, and to lay, and maintain all necessary water uses, as may be required by Licensee, in its operations on the Property.

    **2.6**    *Development.* Licensees shall undertake, within a reasonable time hereof, the development of the Lithium Mines as provided herein above, including the construction of the necessary infrastrucure and facilities for mining ores and minerals, including buildings, equipment, layout, and setup.

## 3.    Relationship of the Parties:

    **3.1**    *Licensee's Duties*: Licensee's performance of its duties and obligations under this Agreement shall obligate Licensee to invest those funds necessary to perform those tasks necessary to commence mining and extraction operations, including the investment of those funds of every nature whatsoever necessary to the exploration, development and to Continously Work and produce

minerals from on, or under the Property.

**3.2    *Limitation*:** Licensee may, without notice to Licensor, explore, and conduct geological, geochemical and geophysical investigations, and sample, drill or otherwise explore for, in the manner, and to the extent that Licensee, in its sole discretion, deems advisable to locate, and develop Ores, Minerals, and metals in, on, and under the Property's surface.

**3.3    *No Partnership*:** This Agreement shall not be deemed to constitute any party, in its capacity as such, the partner, agent or legal representative of any other party, or to create any partnership, mining partnership, or other partnership, or other partnership relationship, or fiduciary relationship between them, for any purpose whatsoever. Licensor, and Licensee agrees to defend, indemnify, and hold harmless GEGI, and its directors, officers, employees, agents, and representatives from any and all harm to GEGI arising out of, or relating to this Agreement, and/or any of the activities connected therewith, by any person, business and governmental entity.

**3.4    *Competition*:** Except as expressly provided in this Agreement, each party shall have the free and unrestricted right, independently, to engage in, and receive the full benefits of any and all business endeavors, of any sort whatsoever, outside the Property, or outside the scope of this Agreement, whether or not competitive with the endeavors contemplated herein, without consulting the other, or inviting, or allowing the other therein. In particular, without limiting the foregoing, neither party to this Agreement shall have any obligation to the other as to any opportunity to acquire any money, property, interest or right offered to it outside the scope of this Agreement.

**4.    Term:** The Mining License Agreement shall have a maximum term of five (5) years, from the the date of the Mine Licensing Agreement, and shall terminate earlier upon Licensee's removal of nine hundred thousand (900,000) metric tons of Lithium. The term of this Agreement shall continue only for so long as Licensee Continuously Works to produce or process Minerals from the Property, in commercial quantities, from the Effective Date, unless terminated, canceled, or extended, as herein provide. Licensee represents that it can and agrees to fulfill the following procedures. It shall proceed in the following phases.

**4.1    *First Phase*.** The first phase of the project is the investigation and piloting of the processing alternatives of the Salar de Uyuni, the construction of the necessary infrastructure and services.

**4.2    *Second Phase*.** The second phase plans the construction of those number of hectares of evaporation pools, as well as the construction and operation of industrial plants for lithium and potassium salts, and all the necessary auxiliary facilities to reasonably develop the property in a timely manner, as dictated by the Mining License Agreement's time limits.

**4.2.1   Civil Works made up of:**
1.    The office block;
2.    The block of workshops and laboratories;

MLicA.02.KHG.K22.wpd              Page 5 of 21

3.   The tank block unit;
4.   The process block;
5.   Construction of evaporation pools (halite, sylvinite, caralities, ets.);
6.   The fencing of the venue with Olympic mesh;
7.   The hydro sanitary and sewage system of the entire plant;
8.   Parking and workshops; and
9.   Works in the goal.

**4.2.2**   The development of the Li2C03 plant, and final elimination of Magnesium and Boron remains.

**4.2.3**   The industrial manufacture of cathodic material.

**4.2.4**   The proper use of appropriate technologies to minimize environmental impacts, by reducing the consumption of water to produce lithium hydroxide.

**4.3**   ***Third Phase.***  The marketing and sales of ore, and minerals, including Lithium.

**4.4**   **Responsibilities Upon Termination.**  Upon termination, for any reason, Licensee shall terminate its exploration, development, mining and processing activities on the Property, and commence reclamation as required by applicable laws, regulations, and the terms and conditions of any governmental plan of operations, permit, license or approval.

**5.**   **Payments:**  Licensee shall make the following payments:

**5.1**   ***Finders Fees.***  Upon signing the Mining License Agreement, the Licensees shall immediately wire transfer to the attorney-client trust account of Peterson & Kell, ALC, at US Bank the sum of Five Million US Dollars ($5,000,000). Thereafter, twenty days following the execution of the Mining License Agreement the Licensee shall immediately wire transfer to the attorney-client trust account of Peterson & Kell, ALC, at US Bank, the additional sum of Five Million US Dollars ($5,000,000).

**5.2**   ***One Time Fee.***  Seven days after the execution of the Mining License Agreement, the Licensee, in part consideration thereof, shall execute a document promising to pay Licensor One Hundred Million Dollars ($100,000,000), US dollars, which sum shall bear interest for six months thereafter at the rate of 1%, per annum ("Debt"). The Debt shall be reduced at the end of six months by the amount of twenty-five million dollars ($25,000,000) US, and shall thereafter bear interest at the rate of 6% per annum, all due, and payable, within one year. In the event of default the Debt will bear interest at 10%, compounded annually. The Debt will have a provision for attorney fees and arbitration, in California, applying California law, and an award of attorney fees, and costs, for its collection, and anti dilution provisions of its pledged assets. The Debt will be secured by the pledge of Chairman Sung Woon Yoo, of his shares of Indong Advanced Materials, Inc., a Republic of Korea corporation, ("Indong") Eurocell, Inc., a Republic of Korea corporation ("Eurocell"), and FIC Advanced Materials Inc., ("FIC"), purusant to a pledge agreement to be executed concurrent with the Debt instrument, and will grant a secured interest in additional  assets, in that amount necessary

to fully secure the Debt.

**5.3**   *Royalty Payments.*

|       |             |         |
|-------|-------------|---------|
| 5.3.1 | **MHE/VMATE.** | 10.00%  |
| 5.3.2 | **GEGI**    | 2.50%   |
| 5.3.3 | **GEC**     | 2.50%   |

**5.4**   <u>Net Revenues</u>.  Net Revenues are to be paid quarterly, as computed according to Exhibit "A", and distributed to the entities set forth herein below, in the percentages of Net Revenue amounts, as follows:

|       |                |      |
|-------|----------------|------|
| 5.4.1 | **Licensee**   | 60%  |
| 5.4.2 | **GEC**        | 18%  |
| 5.4.3 | **GEGI**       | 20%  |
| 5.4.4 | **Indigenous** | 2%   |

**5.5**   <u>Minimum Additional Payments</u>.  In liu of the up front payments previously agreed to, the Parties agree that the Licensor will make (calender) quarterly payments, from the gross proceeds from sales (Royalty Payment), in the amount of 5% thereof, (2.50% to GEGI and 2.50% to GEC) based on a minium value that being the greater of $75,000 per metric ton, or the London Metal Exchange's fair market price's average over the quarter.

**6.**   <u>Compliance with the Law:</u>  The exercise by Licensee of any rights, privileges, grants and uses under this Agreement shall conform at all times with the applicable laws and regulations of Bolivia and MHE, VMATE, YLB, and Department of Potosi, Municipality of Uyuni, and other local laws, regulations and ordinances and the Licensee shall be fully responsible for compliance with all applicable reclamation statutes, regulations and ordinances relating to such work, all at Licensee's cost, and Licensee shall indemnify, hold harmless, and defend Licensor, and GECI, from any and all claims, assessments, fines and actions arising from Licensee's failure to perform the foregoing obligations. Licensor agrees to cooperate with Licensee in Licensee's application for governmental licenses, permits and approvals, the costs of which shall be borne by Licensee.

**7.**   <u>Mining Practices: Inspection of Data Reports:</u>

**7.1**   *Mining Practices*:  Licensee shall Continuously Work the Property, in a miner-like fashion.

**7.2**   *Inspection of Data*:  During the term of this Agreement, Licensor shall have the right to examine noninterpretive factual data regarding the Property in Licensee's possession during reasonable business hours and upon prior notice, provided, however, that the rights of Licensor to examine such data shall be exercised in a manner such that inspection does not unreasonably interfere with the operations of Licensee.

MLicA.02.KHG.K22.wpd                     Page 7 of 21




**7.3     _Reports_:** Licensee shall deliver to Licensor, on or before the thirtieth (30th) day after the end of each calendar year, a summary report of all exploration or development work conducted by Licensee on the property for the previous year. Notwithstanding the foregoing, Licensee shall not be required in its reports to disclose proprietary information or information concerning, or which might tend to reveal processes, techniques, or equipment, which Licensee is under a contractual obligation not to reveal.

**7.4     _Measurement Analysis_:** Licensee shall measure Ore, grade, take and analyze samples, in accordance with industry practice, and shall keep accurate records thereof as a basis for computing the net proceed payments. These records shall be available for inspection and copying by Licensor at all reasonable times subject to the provisions of this Agreement regarding accounts, records and payments.

**8.     Production Records:** Licensee shall keep accurate records of the extraction, inventory, stockpiles, sales, and shipments of Product from the Property, and these records shall be available for inspection and copying by Licensor, at all reasonable times.

**9.     Stockpiling and Waste:**

**9.1     _Stockpiling_:** To the extent permitted by applicable Bolivian, MHE, VMATE, YLB, and Department of Potosi, Municipality of Uyuni laws, regulations and ordinances, Licensee shall have the right to stockpile, on the Property, or on other lands, any Ore, Minerals, materials, or Waste mined, or produced from the Property, at such place or places as Licensee may elect, without the obligation to remove them from where stockpiled, or to return them to the Property. The stockpiling of Ore, or materials from the Property, on other lands shall not be deemed a removal or shipment thereof, requiring payment in respect of Licensor's interest. Licensee shall have the right to stockpile, on the Property, without obligation to remove the same, at any time, any Ore, materials or Waste mined or produced by Licensee from other lands.

**9.2     _Waste_:** Waste, overburden, surface stripping, and other materials from the Property may be deposited on or off the Property. Nothing in this Section shall limit the provisions of this Agreement concerning stockpiling Product on, or off the Property.

**10.     Mixing:** Licensee shall have the right to commingle Ore from the Property, or from other properties. Before commingling the Ore from the Property, and Ore from other Property, Licensee shall measure and sample Ore from the Property in accordance with sound mining and metallurgical practice for metal content. Representative samples of Ore and other Ores shall be retained by Licensee, and assays of these samples shall be made before commingling to determine the metal content of each Ore. Detailed records shall be kept by Licensee showing measurements, assays of metal content and gross metal content of the Ore and other Ore and such records shall be made available to Licensor at all reasonable times for examination and copying.

MLicA.02.KHG.K22.wpd                    Page 8 of 21

 

**11.     Treatment:** Licensee shall be required to beneficiate, concentrate, refine, leach and otherwise treat the Lithium ore, but shall not be required, to beneficiate, concentrate, smelt, refine, leach and otherwise treat in any manner any other Ore, other Product and other materials mined or produced from the Property. Such treatment may be conducted wholly or in part at a plant or plants established or maintained on the Property or on other lands. Licensor shall have no right, title or interest in tailings or residue.

**12.     Scope of Agreement:** This Agreement shall extend to and include only the Property described in this Agreement, the Exhibits of this Agreement, and all covenants, obligations, representations and warranties as herein provided for,

**13.     Compliance with Bolivia, MHE, VMATE, YLB, and Department of Potosi, Municipality of Uyuni's Land Policy and Management Practices: Annual Assessment of Work: Patent Application and Conversion of Claims:**

**13.1     *Compliance with Bolivian Land Policy and Management Practices*:** Licensor represents and warrants that: (a) All of the mining claims have been posted in accordance with the mining laws of Bolivia, MHE, VMATE, YLB, and the Department of Potosi, and Municipality of Uyuni, and in accordance with their rules, and regulations; and (b) None of the mining claims are subject to invalidation or forfeiture as a result of any failure to comply with said laws, and the regulations promulgated thereunder, or as a result of any other act or omission of Licensor.

**13.2     *Annual Assessment Work*:** Beginning with the annual assessment work period ending September 30th, and for each annual assessment work period commencing during the term of this Agreement, Licensee shall perform, for the benefit of the Property, work of a type customarily deemed applicable as assessment work, and of sufficient value to satisfy the annual assessment work requirements of all Bolivian, MHE, VMATE, YLB, and Department of Potosi, Municipality of Uyuni applicable laws, regulations, and ordinances, and shall prepare evidence of the same in a form proper for recordation and filing, and shall timely record and/or file such evidence in the appropriate governmental office as is required by applicable Bolivian, MHE, VMATE, YLB, and Department of Potosi, Municipality of Uyuni laws, regulations and ordinances, provided that if Licensee elects to terminate this Agreement before July 1 of any year, it shall have no further obligation hereunder to perform annual assessment work, nor to prepare, record and/or file evidence of the same with respect to that year.

**13.3     *Licensee Maintenance Fees*:** Licensee agrees to pay all miner maintenance fees, for each mining claim.

**13.4     *Patent Application*:** Licensee may, at its expense, seek to patent, in Licensor's name, any and all unpatented mining claims which are part of the Property. Licensor pledges full cooperation to Licensee in executing any documents necessary to accomplish patenting, if so desired by Licensee. If Licensee begins patent proceedings, and Licensee desires to discontinue them, or if this Agreement is terminated while patent proceedings are pending, Licensee shall have no further

MLicA.02.KHG.K22.wpd               Page 9 of 21

obligation with respect thereto, except to pay any unpaid expenses accrued in such proceedings prior to its request to discontinue, or prior to termination, whichever occurs first. If the patent application results in cancellation of any unpatented claims, Licensee shall not be liable for any claims, losses or damages resulting from such cancellation. Licensor appoints Licensee as Licensor's lawful Attorney-In-Fact for the purpose of patent applications. All patents shall be part of the Property, and the parties will promptly, after issuance of each patent, execute and deliver an addendum to this Agreement, and a memorandum of this Agreement to such effect.

**13.5** *Conversion of Claims*: If the mining laws applicable to the unpatented mining claims subject to this Agreement are amended or repealed, and if in either case the interests of Licensor in the unpatented mining claims are converted, or authorized to be converted, the interest of Licensee in the unpatented mining claims, as amended or converted, shall be subject to and shall constitute the Property subject to this Agreement. If, pursuant to any amendment of the mining laws, Licensor is granted the right to convert its interest in the unpatented mining claims comprising the Property to another right, or interest, Licensee may, in Licensee's discretion, and in Licensor's name, elect such conversion. Should Licensee make such election, Licensee shall bear the cost of the application for such conversion. Licensee shall, during the term of this Agreement, pay all periodic payments required to preserve or maintain such converted interest, including without limitation, permit, license holding fees or other periodic payments. Any, and all production Royalties, or fees, based on, or assessed against production of Minerals from the Property, which are paid by Licensee to Bolivia, MHE, VMATE, YLB, the Department of Potosi, and/or the Municipality of Uyuni, shall be credited in Licensee's favor against Licensee's Net Proceeds obligations owed to Licensor and GEGI. On the grant or issuance of such converted interests or rights, the parties shall execute and deliver an addendum to this Agreement by which such converted interests or rights are expressly made subject to the Agreement.

**14.** **Liens and Notices of Non-Responsibility**: Licensor, and Licensee, agree to keep the Property, at all times, free and clear of all liens, charges, and encumbrances, of any and every nature, and description, done, made or caused by them, and to pay all indebtedness and liabilities incurred by, or for them, which may or might become a lien, charge, or encumbrance against the Property, before such indebtedness or liability shall become a lien, charge, or encumbrance, except that Licensee need not discharge or release any such lien, charge or encumbrance so long as Licensee is contesting the same. The parties agree that Licensor shall be informed immediately of the execution of this Agreement by Licensee in order that Licensor can properly, and timely, record a Notice of Non-responsibility in the office of the recorder. Nothing herein shall be construed to prevent Licensee from assigning, pledging, encumbering, or otherwise transferring its interest in this Agreement, or the Property, for the purpose of acquiring financing for its activities or operations on the Property, or for any other purpose, which acts are expressly authorized.

**15.** **Taxes:**

**15.1** *Real Property Taxes*: Licensor shall pay any and all taxes assessed against the Property before the effective date of this Agreement. Licensee shall pay promptly before delinquency

MLicA.02.KHG.K22.wpd                    Page 10 of 21



all taxes and assessments, general, special, ordinary and extraordinary, that may be levied or assessed on Licensee during the term of the Agreement, and upon the Property then remaining subject to this Agreement. All such taxes for the year in which this Agreement is executed, and for the year in which this Agreement terminates, shall be prorated between Licensor and Licensee, except that neither Licensor nor Licensee shall be responsible for the payment of any such taxes which are based upon revenues income or production from the Property assessed solely to the other party. Licensee shall always have the right to contest, in the courts, or otherwise, in its own name, or in the name of Licensor, the validity or amount of any such taxes or assessments, if it deems the same unlawful, unjust, unequal or excessive, or to take such other steps or proceedings as it may Deem necessary to secure a cancellation, reduction, readjustment or equalization thereat before it shall be required to pay the same. Licensee shall upon request furnish to Licensor copies of receipts or proof of payment for all such taxes and assessments when paid.

     **15.2**   *Personal Property Taxes*: Licensee shall pay all taxes assessed against its personal property, improvements or structures placed, or used, on the Property.

     **15.3**   *Income Taxes*: Licensee shall not be liable for any taxes levied on or measured by income, or other taxes applicable to Licensor, based upon payments under this Agreement or based upon the production of Minerals, Ore or Product from the Property.

     **15.4**   *Delivery of Tax Notices*: If Licensor receives tax bills or claims which are Licensee's responsibility, Licensor shall promptly forward them to Licensee for appropriate action, and if they are not received by Licensee at least ten (10) business days before any payment is due, Licensee shall not be responsible for any interest, penalty; charge, expense, or other liability arising from late payment. Licensor agrees to indemnify, and hold harmless Licensee from all of the interest, penalties, charges, expenses or liabilities that may be incurred by Licensee from time to time as a result of Licensor's failure to promptly forward tax bills or claims to Licensee.

**16.**   **Inspection:** Licensor, or Licensor's duly authorized representatives, shall be permitted to enter on the property, and the workings of Licensee thereon at all reasonable times, for the purpose of inspection. Licensor shall have the right to take samples of material from the Property for the purpose of assuring proper and accurate determination and payment of the Net Proceeds, but it shall enter on the Property at its own risk, and in such a manner as not to unreasonably hinder, delay or interfere with the operations of Licensee. Licensor shall indemnify and hold Licensee harmless from any and all damages, claims or demands arising out of injury to Licensor, Licensor's agents or representatives, or any of them, on the Property or on the approaches thereto.

**17.**   **Title Information and Data:** At any time during the term hereof, upon written request by Licensee, Licensor forthwith shall obtain and deliver to Licensee copies of all title documents affecting the Property which Licensor has in its possession or available to it, including copies of any plats and field notes of surveys of the Property. Licensor agrees to make available to Licensee copies of any exploration data, assays, logs, maps, geological, geochemical and geophysical surveys and reports that Licensor may have in its possession, without charge.

MLicA.02.KHG.K22.wpd        Page 11 of 21

 

18.    **Representation of Title:**

18.1    *Un Patented Mining Claims*:  With respect to the Property, Licensor covenants, represents and warrants, which covenants, representations and warranties shall survive termination of this Agreement, that: (a) Licensor will hold the entire and undivided legal and equitable interests in the Property, subject to the paramount title of the Bolivian Government and other matters of title disclosed in this Agreement; (b) Licensor will have good, right and full power to License and to convey the interests described in this Agreement; (c) the Property is free and clear of all liens, claims and encumbrances except as otherwise provided in this Agreement; (d) Licensor shall not commit any act or acts which will encumber or cause a lien to be placed on the Property.

18.2    *Escrow of Patents Pending Dispute:*  At any time while this Agreement is in force and effect and a third party asserts a claim of ownership in the Property or the Minerals which is adverse to the interest of Licensor, or if Licensee is advised by legal counsel for Licensee that it appears that a third party may have such a claim, Licensee may deposit any payments which would otherwise be due to Licensor hereunder into escrow, and give notice of such deposit to Licensor.  In the event of a dispute as to ownership of the Property, the Minerals, the surface of the Property, or the Net Proceeds, payment of Net Proceeds may be deferred until twenty (20) days after Licensee is furnished satisfactory evidence that such dispute has been finally settled, and all provisions as to keeping this Agreement in force shall relate to such extended time for payment.

19.    **Amendment and Relocation of Claims:**  Licensee shall have the right to amend or relocate in the name of Licensor any of the unpatented mining claims subject to this Agreement, which Licensee deems advisable to so amend or relocate. Licensor appoints Licensee as Licensor's lawful Attorney In Fact for the purpose of the location, amendment or relocation of any such claims. All amended or new locations shall be part of the mining claims subject to this Agreement, and the parties will promptly, after amendment or location of such claims, execute and deliver an addendum to this Agreement, and an amended memorandum of this Agreement to such effect.

20.    **Covenant, Warranties and Representations:**  Each of the parties covenants, warrants and represents for itself as follows:

20.1    *Compliance with Laws*:  That it has complied with all applicable laws and regulations of any governmental body, federal, state or local, regarding the terms of this Agreement and the performance thereof.

20.2    *No Pending Proceedings*:  That there are no lawsuits or proceedings pending or threatened which affect its ability to perform the terms of this Agreement.

20.3    *Authority*:  That it has the full right, title and authority to enter into this Agreement, and to perform the same in accordance with its terms. Neither this Agreement, nor its performance, violates or constitutes a default under the provisions of any other agreement to which it is a party or to which it is

MLicA.02.KHG.K22.wpd                 Page 12 of 21



**20.4    *Commissions Finders' Fees*:** That it has not utilized the services of a broker or a finder in the negotiation and/or execution of this Agreement, and that it has not incurred any obligation to pay a broker's commission or finder's fee upon the execution and consummation hereof.

**20.5    *Costs*:** That it shall pay all costs and expense incurred, or to be incurred by it in negotiating and preparing this Agreement, and in closing and carrying out the transactions contemplated by this Agreement.

**21.    Licensor's Covenants, Representations and Warrants:** Licensor covenants, represents and warrants as follows:

**21.1    *Noninterference*:** Licensor hereby covenants that Licensor will not do or permit to be done any act which would, or might hinder, or impair the rights of Licensee to exercise any right granted to Licensee under this Agreement, or to acquire all rights, title and interests in and to the Property

**21.2    *Estoppel Certificate*:** On written request from Licensee, and so long as Licensee is not in default under this Agreement, Licensor will execute and deliver to Licensee an estoppel certificate, in form acceptable to Licensee, whereby Licensor confirms that the Agreement is in full force and effect, and that there are no defaults by Licensor, or Licensee, under the License.

**21.3    *Environmental Conditions*:** Licensor is not aware of, nor has it received notice from any governmental agency, of any condition existing on the Property, or created by Licensor, which is, or might be a violation of any applicable law, regulation, or ordinance.

**22.    Termination by Licensor:** In the event of any default or failure by Licensee to comply with any of the covenants, terms or conditions of this Agreement, Licensor shall be entitled to give Licensee written notice of the default, specifying details of the same. If such default is not remedied within sixty (60) days after receipt of the notice, provided the same can reasonably be done within that time, or, if not, if Licensee has not within that time commenced action to cure the same, or does not after such commencement diligently prosecute such action to completion, then this Agreement shall be deemed canceled and terminated effective on the sixtieth (60th) day after the receipt of the notice.  Termination shall not be based on default or on a failure to remedy the same, which results from any cause beyond the reasonable control of Licensee, including without limitation, the Force Majeure provisions of this Agreement.

**23.    Early Termination:** On the early termination of this Agreement, subject to Licensor's election herein, Licensee shall return the Property, and every part of the Property surrendered, in a state of compliance with applicable laws, regulations, and ordinances of any governmental agency, or authority having jurisdiction of the Property. If Licensee's compliance is incomplete at such time, Licensee shall diligently take the actions necessary to complete compliance. However, Licensor, at Licensor's sole discretion, and upon notice to Licensee, may elect to take possession and ownersip of any personal property, equipment, fixtures, buildings, structures, improvements, Ore, and Minerals,

found on the Property, and Licensee shall by this Agreement's terms be deemed to forfeit title to all of the foregoing. Upon Licensor's election to to take possession, all such personal property, equipment, fixtures, buildings, structures, and improvements, shall be abandoned and left by Licensee in a good state of repair.

**24.   End of Term:** Licensee shall have six (6) months after the termination of this Agreement, and any extension hereof, to remove from the Property all buildings, structures, and equipment, and to restore, or diligently act to restore the Property to an environmentally acceptable state, as Bolivia, MHE, VMATE, YLB, the Department of Potosi, and/or Municipality of Uyuni authorities may require. In Licensor's sole discretion, Licensor may, upon notice to Licensee, require that Licensee abandon, surrender and give possession to Licensor of any buildings, structures, fixtures, or equipment, including personal property, found on the Property, before termination, which property shall be deemed to be owned by Licensor, with no further act on the part of the parties.

**25.   Data:** Upon termination of this Agreement, Licensor shall have the right to request a copy of all non interpretive factual data regarding the Property in Licensee's possession at the time of termination. Licensee agrees that it will, within thirty (30) days after receipt of a timely written demand by Licensor, deliver to Licensor a copy of all such noninterpretive factual data. Licensee shall have no liability on account of any such information received or acted on by Licensor or any other party to whom Licensor delivers such information. Licensor must exercise its right to request the information referred to herein, in writing, and must give such written request within thirty (30) days after termination of this Agreement. Absent such timely written demand, Licensee shall have no obligation under this Section to provide such information.

**26.   Confidentiality:** The data and information, including the terms of this Agreement, coming into the possession of Licensor by virtue of this Agreement, shall be deemed confidential, and shall not be disclosed to outside third parties except as may be required to publicly record or protect title to the Property, or to publicly announce and disclose information under the laws and regulations of Bolivia or the MHE, VMATE, YLB, and Department of Potosi, Municipality of Uyuni. Licensee agrees, with respect to any public announcements (other than those exceptions set forth in the preceding sentence), including the announcement of the execution of this Agreement, if any, to inform Licensor of the contents of the announcement or disclosure in advance of its intention to make such announcement in sufficient time to permit Licensor to jointly or simultaneously make a similar public announcement or disclosure if the other party so desires, except that in the event any party anticipates selling or assigning all or a portion of its interest, or negotiations to procure loans from third parties are undertaken, such party shall have the right to furnish information to the party to whom such conveyance or assignment is anticipated, or with whom such negotiations are under-taken, upon obtaining from such party an agreement to hold confidential any information so furnished. Nothing in this Agreement shall limit or restrict the right of Licensee to provide, deliver or release to parent companies, companies with a common parent, subsidiary companies, affiliated or related companies and/or coventurers the data and information, including the terms of this Agreement, coming into the possession of Licensee by virtue of this Agreement.

**27.**     **Force Majeure:**  The respective obligations of either party, except Licensee's obligation to maintain the insurance and perform the annual assessment work required under this Agreement, shall be suspended during the time and to the extent that such party is prevented from compliance, in whole or in part, by war or war conditions, actual or potential, earthquake, fire, flood, strike, labor stoppage, accident, riot, unavoidable casualty, act or restraint, present or future, of any lawful authority, statute, governmental regulation or ordinance, environmental restrictions or conditions, permit or license approvals, act of God, act of public enemy, delays in transportation, or other cause of the same or other character beyond the reasonable control of such party.

**28.**     **Disputes not to Interrupt Operations:**  Disputes or differences between the parties shall not interrupt performance of this Agreement or the continuation of Licensee's operations. In the event of any dispute or difference, operations may be continued, and settlements and payments may be made in the same manner as before such dispute or difference.

**29.**     **Memorandum Agreement:**  Upon execution of this Agreement, the parties shall execute and cause to be delivered a short form of this Agreement which shall be registered before the local Government Property offices wherein all, or part of the Property is located. The execution and recording of the memorandum of Agreement shall not limit, increase or in any manner affect any of the terms of this Agreement, or any rights, interest or obligations of the parties.

**30.**     **Notices:**  Any notices required or authorized to be given by this Agreement shall be in written form.  Any notices required or authorized to be given by this Agreement may be sent by registered or certified "delivery", postage prepaid, and return receipt requested", addressed to the proper party at the following address or such address as the party shall have designated to the other party in accordance with this Section. Any notice required or authorized to be given by this Agreement shall be deemed to have been sufficiently given or served in written form if mailed as provided herein, personally delivered to the proper party, or sent by telex, telegraph, facsimile or other wire service, and actually received by such parry. Such notice shall be effective on the date of receipt by the addressee party.

If to Licensor:

GEC Explorations Inc.,
2448 East 81st Street, Suite 445,
Tulsa, Oklahoma 74137,

If to Licensee:

Indong Advanced Materials, Inc.,
54 Gajangsaneopseo-ro, Osan-si,
Gyeonggi-do, Korea  18103

MLicA.02.KHG.K22.wpd            Page 15 of 21

If to Facilitator, Green Energy Global Inc., to its Attorney:

Rollie A Peterson
Peterson & Kell
11230 Gold Express Drive, Ste 310-321
Gold River, Ca 95670-4484

**31.     Binding Effect of Obligations:**  This Agreement shall be binding upon and inure to the benefit of the respective parties and their heirs, successors and assigns.

**32.     Whole Agreement:**  The parties agree that the whole agreement between them is written in this Agreement, and in a memorandum of agreement, of later date, which is intended to be recorded. There are no terms or conditions, express or implied, other than expressly stated in this Agreement. This Agreement may be amended, or modified, only by an instrument in writing, signed by the parties with the same formality as this Agreement.

**33.     Governing Law:**  This Agreement shall be construed and enforced in accordance with the laws of the state of California, USA. Any dispute arising out of this Agreement shall be resolved by binding arbitration, under the rules set forth in California Code of Civil Procedure, Section 1280 et seq. The Agreement has been written in both English and in Korean. In the event of any discrepancies in the translation between the two languages, the English text will control.

**34.     Multiple Counterparts:**  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall constitute the same Agreement.

**35.     Severability:**  If any part, term or provision of this Agreement is held by a court of competent jurisdiction to be illegal, or in conflict with any law of Bolivia, the validity of the remaining portions or provisions shall not be affected and the rights and obligations of the parties shall be construed and enforced as if the Agreement did not contain the particular part, term or provision held to be invalid.

**36.     Bankruptcy or Insolvency Proceedings by Licensee:**  If Licensee be adjudged bankrupt or insolvent, or shall make an assignment for benefit of creditors, this Agreement shall thereupon immediately terminate, and it being further understood, and agreed that this Agreement shall not be assignable by any process of law, nor be treated as an asset of Licensee in any bankruptcy or insolvency proceedings; nor shall it pass under the control of any trustee or assignee of Licensee by virtue of any proceedings in bankruptcy or insolvency, or under any assignment by Licensee for the benefit of creditors.

**37.     Assignment:**  With the prior written consent from the other party, in accordance with the terms of this Agreement, either party may assign its respective rights and obligations under this Agreement, provided that the assignee executes an assumption of all of the assignor's obligations

MLicA.02.KHG.K22.wpd                    Page 16 of 21

hereunder, and agrees to be bound by all the terms and conditions of this Agreement. No such assignment shall in any way enlarge or diminish the right or obligations of Licensee, or Licensor hereunder. Upon the assumption by the assignee of the assignor's obligations, the assigning party shall not be released from, and shall be liable and responsible to the non-assigning party, for any duties, costs, payments or other liabilities or obligations that arise or accrue directly or indirectly under this Agreement. A fully executed memorandum of assignment in recordable form shall be provided to the non-assigning party by the assigning party.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

LESSOR:

GEC Explorations Inc., a
Delaware Corporation

By: _____

Donald Demery, President

LESSEE:

Indong Advanced Materials, Inc.,
a Republic of Korea corporation

By: _____

Sung Woon Yoo, Chairman

FACILITATOR:

Green Energy Global Inc., an
Arizona, corporation

By: _____

Muhammed Gazanfer Khan, President

MLicA.02.KHG.K22.wpd          Page 17 of 21

EXHIBIT "A"

Claim Name:

"PROJECT FOR THE INDUSTRIALIZATION OF EVAPORITE RESOURCES
OF BOLIVIA" being all those lithium deposits found in the Salar de Uyuni.

That land that will be determined by survey by the terms and conditions of this Agreement, and
agreed to by the party, containing 900,000 metric tons of lithium, and whose description will be
later inserted hereby.

## EXHIBIT B

## NET PROCEEDS CALCULATION

**1.1 Income and Expenses.** Net Proceeds shall be calculated by deducting from the Gross Revenue (as defined below) realized (or deemed to be realized), such costs and expenses attributable to Exploration, Development, Mining, the marketing of Products and other Operations as would be deductible under United States generally accepted accounting principles and practices consistently applied, including, without limitation:

(a) All costs and expenses of replacing, expanding, modifying, altering or changing, from time-to-time, the Mining facilities.  Costs and expenses of improvements (such as haulage ways or mill facilities) that are also used in connection with workings, other than the Properties, shall be charged to the Properties only in the proportion that the ft use in connection with the Properties bears to their total use;

(b) Value Added Taxes, real property, and unsecured personal property taxes, and all taxes, other than income taxes, applicable to Mining of the Properties, including without limitation all mining taxes, sales taxes, severance taxes, license fees and governmental levies of a similar nature;

(c) A pro rata portion of (I) the salaries and expenses of employees serving Operations whose time is not allocated directly to such Operations, and (III) the costs of maintaining and operating an office and any necessary sub office and (III) all necessary camps, including housing facilities for employees, used for Operations. The expense of those facilities, less any revenue therefrom, shall include depreciation or a fair monthly rental in lieu of depreciation of the investment;

(d) All expenses incurred relative to the sale of Products, including an allowance for commissions at rates, which are normal and customary in the industry.

(e) All amounts payable to the Operator during Mining pursuant to any applicable operating or similar agreement in force with respect thereto;

(f) The actual cost of investment under the Agreement, but prior to beginning of Mining, which shall include all expenditures for Exploration and Development of the Properties.

(g) Interest on monies borrowed or advanced for costs and expenses, but in no event in excess of the maximum permitted by law;

(h) An allowance for reasonable working capital and inventory;

MLicA.02.KHG.K22.wpd                    Page 19 of 21            

(i) Actual costs of Operations; and

(k) Rental, royalty, production and purchase payments.

For purposes hereof, the term "Gross Revenue" shall include the sum of (I) gross receipts from sale of Products, less any charges for sampling, assaying, or penalties; (II) gross receipts from the sale or other disposition of Assets; (III) insurance proceeds; (IV) compensation for expropriation of Assets; and (V) judgment proceeds.

It is intended that Indong shall recoup from Gross Revenue all of its on-going contributions for Exploration, Development, Mining, Expansion and Modification and marketing Products before any Net Proceeds are distributed. No deduction shall be made for income taxes, depreciation, and amortization.

MLicA.02.KHG.K22.wpd          Page 21 of 21





# EXHIBIT "B"

**ACUERDO DE EMPRESA CONJUNTA MINERA**

Este "Acuerdo" de Joint Venture Minero se celebra y entra en vigor el 2 de agosto de 2022, por y entre Quantum Trust, SGSR, Donald Demery, Trustee ("Trust") ubicado en 161 Water Street, Norwich, CT 06360, y Green Energy Global Inc., una corporación de Arizona, 333 North Wilmot Road, Tuscon, Arizona 85711 ("GEGI"), en la primera parte, y el Ministerio de Hidrocarburos y Energía del Estado Plurinacional de Bolivia MHE a través del Viceministerio de Tecnologías de Alta Energía "VMATE" Litio, Energía Nuclear Litio Boliviano Depósitos, ubicado en Avenida Mariscal Santa Cruz s/n, Edificio HANSA Piso 19, en la segunda parte. Los Universidad Mayor de San Simón, Av. Ballivián esquina Reza #591 Cochabamba, Bolivia

**CONSIDERACIONES**

**MIENTRAS**, GEGI y el Fideicomiso realizarán importantes depósitos de dinero, a favor de la PROYECTO DE INDUSTRIALIZACIÓN DEL LITIO;

**MIENTRAS**, los yacimientos de litio más grandes de Bolivia se encuentran en el Salar de Uyuni, perteneciente al departamento de Potosí. El salar es uno de los más grandes del mundo, y su costra de sal cubre un área de 11.098 hectáreas, conteniendo un mínimo de 9.000.000 de toneladas métricas de litio;

**MIENTRAS**, Yacimientos de Litios Bolivianos ("YLB") es una Empresa Pública Estratégica Nacional de Bolivia ("EPNE"), empresa, con presencia nacional en todas las actividades de industrialización del litio boliviano, siendo su principal objetivo y rol estratégico la participación en toda la cadena productiva , así como en actividades de importación y exportación;

**MIENTRAS**, GEGI y el Fideicomiso, con el propósito de desarrollar minas comerciales de litio en el Salar de Uyuni, desea formar una empresa conjunta ("Joint Venture") con YLB, VMATE y MHE (colectivamente "Bolivia"), la Joint Venture propietaria los Reclamos Mineros no patentados ubicados en el Municipio de Uyuni, Bolivia, dichas concesiones mineras se describen más particularmente en el Anexo "A", adjunto, y por esta referencia se incorporan a este Acuerdo ("Patrimonio Minero"); y

**MIENTRAS**, GEGI y el Fideicomiso, por la contraprestación que se establece a continuación, desarrollarán oportunamente la Propiedad Minera, y Bolivia, por la contraprestación que se establece a continuación, reservará, para la posesión exclusiva del Joint Venture, la Propiedad Minera y las instalaciones mineras que se encuentren en él, para el desarrollo del Patrimonio Minero por parte de GEGI y el Fideicomiso.

**POR LO TANTO**, en consideración de las promesas mutuas establecidas en este Acuerdo, GEGI y el Fideicomiso y Bolivia acuerdan lo siguiente:

1.      **Definiciones:** Los siguientes términos definidos, siempre que se utilicen en este Acuerdo, tendrán los significados que se describen a continuación:

     1.1      **"Bolivia"**significará, colectivamente, YLB, EPNE, MHE y VMATE.

     1.2      **"Día laboral"**se entenderá por días laborables, pero excluyendo todos los días festivos que sean reconocidos por el Estado Plurinacional de Bolivia.

     1.3      **"Trabajo Continuo"**significará actividades ininterrumpidas necesarias para prepararse para el desarrollo y extracción de minerales, excepto aquellos períodos durante las temporadas de lluvia cuando la extracción no sea física y económicamente razonable posible, y períodos de no más de 30 días hábiles

continuos, en cualquier año de empresa conjunta, y durante períodos de fuerza mayor, como se define a continuación.

1.4    **"Fecha efectiva"**significará la primera fecha escrita arriba.

1.5    **"Fuerza mayor"**significa un evento extraordinario que está más allá del control razonable de una de las partes y que impedirá directamente que una o más de las partes cumplan, incluidas guerras, huelgas, disturbios y pandemias, pero excluyendo la negligencia o mala conducta de una de las partes.

1.6    **"Ingresos brutos"**incluirá todos los recibos pagados a GEGI y al Fideicomiso por todos y cada uno de los minerales, de cualquier tipo, que se extraigan de la propiedad minera, y que GEGI y el Fideicomiso extraigan y vendan. Los ingresos incluirán formas de pago de cualquier tipo, incluidos, entre otros, dinero y moneda de cualquier nación, incluidos pagos y bienes electrónicos, incluidas criptomonedas, como Bitcoin, y otros activos de capital digital y monedas virtuales.

1.7    **"Año de la empresa conjunta"**significará cada período de 1 año después de la Fecha de vigencia y cada aniversario de la Fecha de vigencia.

1.8    **"Minerales"**significa carbonato de litio, ya sea que se sepa que existe, descubierto o extraído después de la Fecha de entrada en vigencia.

1.9    **"Reclamo Minero"**significa depósitos en parcelas de tierra que se encuentran dentro de las parcelas mineras del estado para las cuales GEGI y el Fideicomiso afirman un derecho de posesión no exclusivo, y el derecho a desarrollar y extraer minerales y/o minerales descubiertos y valiosos.

1.10   **"Lngresos netos"**significará el cálculo del Ingreso Neto, según lo dispuesto en el Anexo "B" de este Acuerdo, adjunto al presente, e incorporado aquí por esta referencia.

1.11   **"Mineral"**significará carbonato de litio y materiales de la propiedad, cuya naturaleza y composición, a juicio exclusivo de GEGI y el Fideicomiso, justifica ya sea (a) extracción o remoción del sitio, envío y venta de los mismos, o entrega a un procesador planta para su tratamiento físico o químico; o (b) lixiviación en el lugar.

1.12   **"Producto"**significará: (a) todo el mineral embarcado y vendido; y (b) todos los concentrados, precipitados y productos y subproductos producidos por, o para GEGI y el Fideicomiso a partir del mineral.

1.13   **"Propiedad"**significará las concesiones mineras no propietarias descritas en el Anexo "A" de este Acuerdo.

1.14   **"Confianza"**significa Quantum Trust, SGSR, Donald Demery y Mohammad Ganzafer Khan, fideicomisarios ("Fideicomiso"), ubicado en 161 Water Street, Norwich, CT 06360.

1.15   **"Reclamos Mineros No Propietarios"**significa aquellas concesiones mineras en las que el gobierno posee el título de propiedad minera subyacente.

1.16   **"Desperdicio"**significará tierra, roca o material extraído o extraído de la propiedad, y productos químicos utilizados para la minería durante la vigencia de este acuerdo, pero que no sean minerales.





2.    **Otorgamiento de Privilegios de Exploración. Usos y Derechos de Agua:**

    2.1    **Concesión de Privilegio de Exploración**: Sujeto a los términos y condiciones de este Acuerdo y en la medida permitida por Bolivia, MHE, VMATE, YLB, el Departamento de Potosí y las leyes, reglamentos y ordenanzas del Municipio de Uyuni, Bolivia otorga a GEGI y al Fideicomiso y a sus cesionarios, el derecho y privilegio exclusivo de ingresar a la Propiedad, con el propósito de exploración y prospección de Minerales, Sustancias Minerales, metales, Minerales con minerales y rocas de todo tipo, incluyendo el derecho de entrada y salida para el personal, maquinaria, equipos, suministros y productos, y el derecho a utilizar la mayor parte de la tierra y el agua sobre y debajo de ella como sea razonablemente necesario para tales fines.

    2.2    **Proyecto conjunto:**Sujeto a los términos y condiciones de este acuerdo, y en la medida permitida por las leyes, reglamentos y ordenanzas bolivianas, MHE, VMATE, YLB y el Departamento de Potosí, Municipio de Yuni y demás leyes, reglamentos y ordenanzas locales aplicables, Bolivia cede exclusivamente a la Empresa Mixta la Propiedad para desarrollar, producir, extraer y comercializar todas las sustancias minerales, metales, materiales minerales y rocas de toda clase. Los derechos sujetos a este Acuerdo incluyen todos los derechos, títulos e intereses de Bolivia en los Reclamos de Propiedad y Minería descritos en este Acuerdo, incluyendo, sin limitación, superficie y subsuelo, todos los minerales, elementos minerales, compuestos y derechos minerales, todas las aguas, áridos derechos de agua, recursos geométricos y aguas geométricas en y sobre la propiedad. O, correspondiente a la propiedad y todos los derechos, títulos e intereses que pudieran adquirirse para Bolivia o para Bolivia en o perteneciente a la propiedad, o cualquier otra parte de la misma,

    2.3    **Usos:** Ya sea que esté actualmente contemplado o se sepa que se utilizará en la minería, extracción, producción o procesamiento de minerales, recursos hídricos o geotérmicos o recursos energéticos, o cualquiera de los derechos o privilegios de GEGI y el Fideicomiso, en virtud de este Acuerdo. Además, se otorga a GEGI y al Fideicomiso el derecho, en la medida en que Bolivia pueda otorgar legalmente el derecho, de desviar arroyos, remover soportes laterales y subyacentes, usar, hundir, consumir o destruir la superficie, o cualquier parte de la misma, para depositar tierra , rocas, Desperdicios, Minerales Magros y materiales en cualquier parte del Bien, para lixiviar los mismos y cometer Desperdicios.

    2.4    **Derechos de agua:** Bolivia otorga a GEGI y al Fideicomiso todos los derechos de agua bolivianos correspondientes a la Propiedad, sujeto a las normas del municipio Salar de Uyuni, en el que se ubica la Propiedad, en cuanto a la apropiación y captación de agua, para los fines del Joint Venture. GEGI y el Fideicomiso tendrán derecho a apropiarse y utilizar el agua para perforar pozos de agua en la Propiedad, y establecer y mantener todos los usos de agua necesarios, según lo requieran GEGI y el Fideicomiso, en sus operaciones en la Propiedad.

3.    **Relación de las Partes:**

    3.1    **Deberes de GEGI y del Fideicomiso:**El desempeño de GEGI y el Fideicomiso de sus deberes y obligaciones en virtud de este Acuerdo obligará a GEGI y al Fideicomiso a invertir los fondos necesarios para realizar las tareas necesarias para comenzar las operaciones de minería y extracción, incluida la inversión de fondos, de cualquier naturaleza necesaria para la exploración. , desarrollo, y trabajar y producir continuamente minerales desde, sobre o debajo de la propiedad.

**3.2    Limitación:**GEGI y el Fideicomiso pueden, sin previo aviso a Bolivia, explorar y realizar investigaciones geológicas, geoquímicas y geofísicas, y muestrear, perforar o explorar de otro modo, de la manera y en la medida en que GEGI y el Fideicomiso, a su sola discreción, consideren apropiado, y conveniente, y ubicar y desarrollar Minerales, Minerales y metales, en, sobre y debajo de la superficie de la Propiedad.

**3.3    Proyecto conjunto:**Se considerará que este Acuerdo constituye y crea un empresa minera Joint Venture Relación entre ellos. GEGI será la parte administradora del Joint Venture.

**3.4    Competencia:**Salvo que se disponga expresamente en este Acuerdo, cada parte tendrá el derecho libre y sin restricciones, de forma independiente, de participar y recibir todos los beneficios de todos y cada uno de los esfuerzos comerciales, de cualquier tipo, fuera de la Propiedad o fuera del alcance de este Acuerdo, compita o no con los esfuerzos aquí contemplados, sin consultar al otro, ni invitar o permitir que el otro participe. En particular, sin limitar lo anterior, ninguna de las partes de este Acuerdo tendrá ninguna obligación con la otra por cualquier oportunidad de adquirir cualquier dinero, propiedad, interés o derecho que se le ofrezca fuera del alcance de este Acuerdo.

**4.    Término:** El término de este Acuerdo será de treinta (30) años, a partir de la Fecha Efectiva, y mientras GEGI y el Fideicomiso Trabajan Continuamente, preparándose y comenzando a extraer, y luego producir o procesar Minerales de la Propiedad, en términos comerciales y cantidades , a menos que sea rescindido o cancelado, como se establece en este documento. Mientras GEGI y el Fideicomiso no infrinjan este Acuerdo, GEGI y el Fideicomiso podrán prorrogar este Acuerdo por un plazo adicional de diez 10 años, con 180 días de notificación previa por escrito a Bolivia, todo de conformidad con los términos y condiciones de este acuerdo. Al momento de la rescisión, por cualquier motivo, GEGI y el Fideicomiso cesarán sus actividades de exploración, desarrollo, extracción y procesamiento en la Propiedad y comenzarán la recuperación, según lo exija la ley, los reglamentos y los términos y condiciones de cualquier plan gubernamental de operación,

**5.    Participación en los ingresos:**

**5.1    Pago de regalías:** GEGI y el Fideicomiso pagarán a Bolivia el 20% de los Ingresos Brutos de GEGI y el Fideicomiso derivados de la venta de Minerales y Minerales extraídos de la Propiedad Minera, ya sea que GEGI y el Fideicomiso hayan obtenido o no una utilidad de ello. GEGI y el Fideicomiso pagarán regalías, al valor justo de mercado, sobre los Minerales y menas que extraiga para uso propio de GEGI y del Fideicomiso. Dicho pago a Bolivia se hará en dinero aceptable para Bolivia, dentro de los 60 días siguientes a la entrega de los Minerales a los muelles de embarque, para su embarque.

**5.2    Auditoría:**Bolivia, o sus agentes autorizados, tendrán derecho a auditar e inspeccionar las cuentas de GEGI y el Fideicomiso, y los registros utilizados para calcular el Ingreso Bruto, derecho que podrá ejercer en cada fecha de pago, en cualquier momento razonable durante un período de ciento veinte 120 días a partir de la fecha de pago, en el cual venció el derecho al pago de GEGI y el Fideicomiso, o hubiera vencido de otro modo. Si no se realiza dicha auditoría durante dicho período, dichas cuentas, registros y pagos se considerarán concluyentemente verdaderos, exactos y correctos.

**5.3    Pago de la Renta Neta:**GEGI y el Fideicomiso pagarán, en beneficio de los indígenas del Departamento de Potosí, el cinco por ciento (5%) de los ingresos



netos por la venta de Minerales de la Propiedad. Una lista de proyectos para el uso de dichas sumas se establece en el Anexo "C", según sea modificado por Bolivia, de tiempo en tiempo. Dicho pago se hará trimestralmente, en la forma y a favor de un beneficiario, designado por Bolivia.

5.4 **Auditoría:**Bolivia, o sus agentes autorizados, tendrán derecho a auditar e inspeccionar las cuentas y registros de GEGI y del Fideicomiso, utilizados en el cálculo de los pagos del producto neto, cuyo derecho podrá ejercerse anualmente, dentro de los 90 días siguientes a la finalización del cronograma del año, y si GEGI y el Fideicomiso han obtenido ganancias o no. Si no se realiza dicha auditoría durante dicho período, dichas cuentas, registros y pagos se considerarán concluyentemente verdaderos, exactos y correctos.

6. **Cumplimiento de la Ley:**El ejercicio por Fideicomiso de cualesquiera derechos, privilegios, concesiones y usos bajo este Contrato se ajustará, en todo momento, a las leyes y reglamentos aplicables de Bolivia y MHE, VMATE, YLB, y el Departamento de Potosí, Municipio de Uyuni, y otras leyes, reglamentos y ordenanzas locales, y GEGI y el Fideicomiso serán completamente responsables del cumplimiento de todos los estatutos, reglamentos y ordenanzas de recuperación aplicables relacionados con dicho trabajo, todo a cargo de GEGI y el Fideicomiso, y GEGI y el Fideicomiso indemnizarán , eximir de responsabilidad, y defender a Bolivia, de todos y cada uno de los reclamos, gravámenes, multas y acciones derivadas del incumplimiento, por parte de GEGI y el Fideicomiso, de las obligaciones anteriores.
Bolivia se compromete a cooperar con la solicitud de licencias requeridas.

7. **Prácticas mineras: Informes de datos de inspección:**

7.1 **Prácticas Mineras:** GEGI y el Fideicomiso Trabajarán Continuamente la Propiedad, en forma minera.

7.2 **Inspección de datos:** Durante la vigencia de este Acuerdo, Bolivia tendrá derecho a examinar datos fácticos no interpretativos, con respecto a GEGI y los Bienes del Fideicomiso, en posesión de GEGI y los Activos del Fideicomiso, durante horas hábiles razonables y previa notificación, siempre que, sin embargo, que los derechos de Bolivia para examinar dichos datos se ejercerán de tal manera que la inspección no interfiera injustificadamente con las operaciones de GEGI y el Fideicomiso.

7.3 **Informes:** GEGI y el Fideicomiso entregarán a Bolivia, en o antes del día 30 posterior al final de cada año calendario, un informe resumido de todos los trabajos de exploración o desarrollo realizados por GEGI y el Fideicomiso sobre la Propiedad, durante el año anterior. Sin perjuicio de lo anterior, no se requerirá que Trust, en sus informes, divulgue información patentada o información relacionada con, o que pueda revelar, procesos, técnicas o equipos, que Trust está contractualmente obligado a no divulgar.

7.4 **Análisis de medición:** GEGI y el Fideicomiso medirán el Mineral, calificarán, tomarán y analizarán muestras, de acuerdo con la práctica de la industria, y mantendrán registros precisos de los mismos como base para calcular los pagos de ingresos netos. Estos registros estarán disponibles para inspección y copia por parte de Bolivia, en todo momento razonable, sujeto a las disposiciones de este Acuerdo con respecto a cuentas, registros y pagos.

8. **Registros de producción:**GEGI y el Fideicomiso mantendrán registros precisos de la extracción, inventario, almacenamiento, ventas y envíos del Producto de Propiedad, y

estos registros estarán disponibles para inspección y copia por parte de Bolivia, en todo momento razonable.

9. **Recogida y Residuos:**

   9.1 **Almacenamiento:**En la medida en que lo permitan las leyes, reglamentos y ordenanzas bolivianas, del MHE, VMATE, YLB y del Departamento de Potosí, Municipio de Uyuni aplicables, GEGI y el Fideicomiso tendrán derecho a almacenar, en la Propiedad o en otros terrenos, cualquier Mineral, Minerales , materiales o Residuos, extraídos o producidos de la Propiedad, en el lugar o lugares que GEGI y el Fideicomiso elijan, sin obligación de retirarlos de donde se encuentren almacenados, o devolverlos a la Propiedad. El acopio de Mineral, o materiales de la Propiedad, en otros terrenos, no será considerado como un traslado o embarque del mismo, requiriendo pago respecto de los intereses de Bolivia. GEGI y el El Fideicomiso tendrá derecho a almacenar, en la Propiedad, sin obligación de retirar de la Propiedad, en cualquier momento, cualquier Mineral, Minerales o residuos extraídos o producidos de GEGI y el Fideicomiso de otras tierras.

   9.2 **Escombros:**Los escombros, la sobrecarga, el decapado de la superficie y otros materiales de la Propiedad pueden depositarse dentro o fuera de la Propiedad. Nada en esta Sección limitará las disposiciones de este Acuerdo relacionadas con el almacenamiento del Producto, dentro o fuera de la Propiedad.

10. **Mezcla:** GEGI y el Fideicomiso tendrán derecho a mezclar el Mineral de la Propiedad, o de otras propiedades. Antes de mezclar el Mineral de la Propiedad y el Mineral de otra propiedad, GEGI y el Fideicomiso medirán y tomarán muestras del Mineral de la Propiedad, de acuerdo con prácticas sólidas de minería y metalurgia, para determinar el contenido de metal. GEGI y el Fideicomiso retendrán muestras representativas del mineral y minerales de otras propiedades, y se realizarán análisis de estas muestras antes de la mezcla, para determinar el contenido de metal de cada mineral. GEGI y el Fideicomiso mantendrán registros detallados que muestren las mediciones, el análisis del contenido de metal y el contenido bruto de metal del Mineral de las Propiedades y del Mineral de las otras propiedades. Y, dichos registros estarán a disposición de Bolivia, en cualquier tiempo razonable para que los examine y copie.

11. **Tratamiento:** GEGI y el Fideicomiso estarán obligados a beneficiar, concentrar, refinar, lixiviar y tratar de otro modo el mineral de litio, pero no estarán obligados a beneficiar, concentrar, fundir, refinar, lixiviar o tratar de otro modo, de ninguna manera, ningún otro mineral, otro Producto , y otros materiales extraídos o producidos de la Propiedad. Dicho tratamiento podrá realizarse total o parcialmente en una planta o plantas establecidas, o mantenidas, en la Propiedad, o en otros terrenos. Bolivia no tendrá ningún derecho, título o interés sobre los relaves o residuos.

12. **Alcance del Acuerdo:** Este Acuerdo se extenderá e incluirá solo la Propiedad descrita en este Acuerdo, los Anexos de este Acuerdo y todos los convenios, obligaciones, representaciones y garantías, según lo dispuesto en este documento.

13. **Cumplimiento con Bolivia, MHE, VMATE, YLB y Departamento de Potosí, Municipio de Uyuni, Política Territorial y Prácticas de Gestión:**Evaluación Anual de Trabajo: Solicitud de Patente y Conversión de Reclamaciones:



**13.1** **Cumplimiento de la Política de Tierras y Prácticas de Gestión de Bolivia:**Bolivia declara y garantiza que: (a) Todas las Declaraciones Mineras han sido publicadas de conformidad con las leyes mineras de Bolivia, MHE, VMATE, YLB, y el Departamento de Potosí, y el Municipio de Uyuni, y de conformidad con sus normas y reglamentos. ; y (b) Ninguno de los Derechos Mineros está sujeto a invalidación o caducidad como resultado del incumplimiento de dichas leyes y los reglamentos promulgados en virtud de las mismas, o como resultado de cualquier otro acto u omisión de Bolivia.

**13.2** **Evaluación Anual del Trabajo:**Comenzando con el período de trabajo de tasación anual que finaliza el 30 de noviembre, y para cada período de trabajo de tasación anual que comience durante la vigencia de este Acuerdo, GEGI y el Fideicomiso, en beneficio de la Propiedad, llevarán a cabo un compromiso del tipo habitualmente considerado aplicable, como un contrato de evaluación, de valor suficiente para satisfacer los requisitos del contrato de evaluación anual de todas las leyes, reglamentos y ordenanzas bolivianas, MHE, VMATE, YLB y Departamento de Potosí, Municipio de Uyuni, y preparará evidencia de la misma de manera adecuada para su registro y radicación, y registrará y/o presentará dicha prueba en la oficina gubernamental correspondiente según lo requieran las leyes, reglamentos y ordenanzas bolivianas, del MHE, VMATE, YLB y el correspondiente Departamento de Potosí, Municipio de Uyuni,disponiéndose que si GEGI y el Fideicomiso eligen rescindir este Acuerdo antes del 1 de julio de cualquier año, no tendrá ninguna otra obligación en virtud del presente de realizar un trabajo de evaluación anual, ni de preparar, registrar y/o presentar evidencia del mismo con respecto a ese año.

**13.3** **Cuotas de mantenimiento del fideicomiso:**GEGI y el Fideicomiso acuerdan pagar todas las tarifas de mantenimiento del minero por cada concesión minera.

**13.4** **Solicitud de patente:**GEGI y el Fideicomiso podrán, a su cargo, solicitar una patente, en nombre del Joint Venture, de todos y cada uno de los Reclamos Mineros no patentados que forman parte de la Propiedad. Bolivia se compromete a cooperar plenamente con el Fideicomiso en la ejecución de cualquier documento necesario para obtener la patente, si GEGI y el Fideicomiso así lo desean. Si GEGI y el Fideicomiso inician procedimientos de patente, y GEGI y el Fideicomiso desean descontinuarlos, o si este Acuerdo se rescinde mientras los procedimientos de patente están pendientes, GEGI y el Fideicomiso no tendrán ninguna otra obligación al respecto, excepto pagar los gastos no pagados. devengados en tales procedimientos, y antes de su terminación, solicitud de terminación, o antes de la terminación, lo que ocurra primero. Si la solicitud de patente da como resultado la cancelación de cualquier reclamo no propietario, Trust no será responsable de ningún reclamo, pérdida o daño que resulte de dicha cancelación. Bolivia designa a GEGI y al Trust como representante legal de Bolivia para efectos de solicitudes de patentes. Todas las patentes se convertirán en parte de la Propiedad, y las partes, inmediatamente después de la emisión de cada patente, ejecutarán y entregarán una adenda a este Acuerdo y un memorando a este Acuerdo, a tal efecto.

**13.5** **Conversión de Declaraciones:**Si se modifican o derogan las leyes mineras aplicables a las Declaraciones de Minería no Proprietaria sujetas a este Acuerdo, y si, en cualquier caso, se convierten los intereses de Bolivia en las Declaraciones de Minería no Proprietaria, o se autoriza la conversión, GEGI y el interés del Fideicomiso en los Reclamos Mineros no patentados, enmendados o convertidos estará sujeto a, y constituirá la Propiedad sujeta a este Acuerdo. Si, conforme a cualquier enmienda a las leyes mineras, a Bolivia se le otorga el derecho de convertir su participación en los Reclamos Mineros no patentados que

comprenden la Propiedad a otra participación o participaciones, GEGI y el Fideicomiso pueden, a discreción de GEGI y el Fideicomiso, y en nombre de Bolivia, opte por dicha conversión. En caso de que GEGI y el Fideicomiso tomen tal decisión, el Fideicomiso asumirá el costo de solicitar dicha conversión. GEGI y el Fideicomiso pagarán, durante la vigencia de este Acuerdo, todos los pagos periódicos requeridos para preservar o mantener dicho interés convertido, incluidos, entre otros, permisos, tarifas de tenencia de licencias u otros pagos periódicos. Todas y cada una de las regalías o tarifas de producción, basadas en la producción de Minerales de la Propiedad o evaluadas contra ella, que sean pagadas por GEGI y el Fideicomiso a Bolivia, MHE, VMATE, YLB, el Departamento de Potosí y/o la Municipalidad de Uyuni, serán acreditado a favor de GEGI y el Fideicomiso contra las obligaciones de la Renta Neta de GEGI y el Fideicomiso adeudadas a Bolivia. En el otorgamiento o emisión de tales intereses o derechos convertidos, las Partes suscribirán y entregarán una adenda a este Acuerdo, por la cual dichos intereses o derechos convertidos quedan expresamente sujetos a este Acuerdo. durante la vigencia de este Acuerdo, pagar todos los pagos periódicos requeridos para preservar o mantener dicho interés convertido, incluidos, entre otros, permisos, tarifas de tenencia de licencias u otros pagos periódicos. Todas y cada una de las regalías o tarifas de producción, basadas en la producción de Minerales de la Propiedad o evaluadas contra ella, que sean pagadas por GEGI y el Fideicomiso a Bolivia, MHE, VMATE, YLB, el Departamento de Potosí y/o la Municipalidad de Uyuni, serán acreditado a favor de GEGI y el Fideicomiso contra las obligaciones de la Renta Neta de GEGI y el Fideicomiso adeudadas a Bolivia. En el otorgamiento o emisión de tales intereses o derechos convertidos, las Partes suscribirán y entregarán una adenda a este Acuerdo, por la cual dichos intereses o derechos convertidos quedan expresamente sujetos a este Acuerdo. durante la vigencia de este Acuerdo, pagar todos los pagos periódicos requeridos para preservar o mantener dicho interés convertido, incluidos, entre otros, permisos, tarifas de tenencia de licencias u otros pagos periódicos. Todas y cada una de las regalías o tarifas de producción, basadas en la producción de Minerales de la Propiedad o evaluadas contra ella, que sean pagadas por GEGI y el Fideicomiso a Bolivia, MHE, VMATE, YLB, el Departamento de Potosí y/o la Municipalidad de Uyuni, serán acreditado a favor de GEGI y el Fideicomiso contra las obligaciones de la Renta Neta de GEGI y el Fideicomiso adeudadas a Bolivia. En el otorgamiento o emisión de tales intereses o derechos convertidos, las Partes suscribirán y entregarán una adenda a este Acuerdo, por la cual dichos intereses o derechos convertidos quedan expresamente sujetos a este Acuerdo. pagar todos los pagos periódicos requeridos para preservar o mantener dicho interés convertido, incluidos, entre otros, permisos, tarifas de tenencia de licencias u otros pagos periódicos. Todas y cada una de las regalías o tarifas de producción, basadas en la producción de Minerales de la Propiedad o evaluadas contra ella, que sean pagadas por GEGI y el Fideicomiso a Bolivia, MHE, VMATE, YLB, el Departamento de Potosí y/o la Municipalidad de Uyuni, serán acreditado a favor de GEGI y el Fideicomiso contra las obligaciones de la Renta Neta de GEGI y el Fideicomiso adeudadas a Bolivia. En el otorgamiento o emisión de tales intereses o derechos convertidos, las Partes suscribirán y entregarán una adenda a este Acuerdo, por la cual dichos intereses o derechos convertidos quedan expresamente sujetos a este Acuerdo. pagar todos los pagos periódicos requeridos para preservar o mantener dicho interés convertido, incluidos, entre otros, permisos, tarifas de tenencia de licencias u otros pagos periódicos. Todas y cada una de las regalías o tarifas de producción, basadas en la producción de Minerales de la Propiedad o evaluadas contra ella, que sean pagadas por GEGI y el Fideicomiso a Bolivia, MHE, VMATE, YLB, el Departamento de Potosí y/o la Municipalidad de Uyuni, serán acreditado a favor de GEGI y el Fideicomiso contra las obligaciones de la Renta Neta de GEGI y el Fideicomiso adeudadas a Bolivia. En el otorgamiento o emisión de tales intereses



o derechos convertidos, las Partes suscribirán y entregarán una adenda a este Acuerdo, por la cual dichos intereses o derechos convertidos quedan expresamente sujetos a este Acuerdo. u otros pagos periódicos. Todas y cada una de las regalías o tarifas de producción, basadas en la producción de Minerales de la Propiedad o evaluadas contra ella, que sean pagadas por GEGI y el Fideicomiso a Bolivia, MHE, VMATE, YLB, el Departamento de Potosí y/o la Municipalidad de Uyuni, serán acreditado a favor de GEGI y el Fideicomiso contra las obligaciones de la Renta Neta de GEGI y el Fideicomiso adeudadas a Bolivia. En el otorgamiento o emisión de tales intereses o derechos convertidos, las Partes suscribirán y entregarán una adenda a este Acuerdo, por la cual dichos intereses o derechos convertidos quedan expresamente sujetos a este Acuerdo. u otros pagos periódicos. Todas y cada una de las regalías o tarifas de producción, basadas en la producción de Minerales de la Propiedad o evaluadas contra ella, que sean pagadas por GEGI y el Fideicomiso a Bolivia, MHE, VMATE, YLB, el Departamento de Potosí y/o la Municipalidad de Uyuni, serán acreditado a favor de GEGI y el Fideicomiso contra las obligaciones de la Renta Neta de GEGI y el Fideicomiso adeudadas a Bolivia. En el otorgamiento o emisión de tales intereses o derechos convertidos, las Partes suscribirán y entregarán una adenda a este Acuerdo, por la cual dichos intereses o derechos convertidos quedan expresamente sujetos a este Acuerdo. el Departamento de Potosí y/o el Municipio de Uyuni, serán acreditados a favor de GEGI y el Fideicomiso contra las obligaciones de la Renta Neta de GEGI y el Fideicomiso adeudados a Bolivia. En el otorgamiento o emisión de tales intereses o derechos convertidos, las Partes suscribirán y entregarán una adenda a este Acuerdo, por la cual dichos intereses o derechos convertidos quedan expresamente sujetos a este Acuerdo. el Departamento de Potosí y/o el Municipio de Uyuni, serán acreditados a favor de GEGI y el Fideicomiso contra las obligaciones de la Renta Neta de GEGI y el Fideicomiso adeudados a Bolivia. En el otorgamiento o emisión de tales intereses o derechos convertidos, las Partes suscribirán y entregarán una adenda a este Acuerdo, por la cual dichos intereses o derechos convertidos quedan expresamente sujetos a este Acuerdo.

14. **Gravamen y Avisos de No Responsabilidad:**Bolivia, y GEGI y el Fideicomiso acuerdan mantener la Propiedad, en todo momento, libre y libre de todo gravamen, cargas y gravámenes, de cualquier naturaleza y descripción, hechos, o causados por ellos, y pagar todas las deudas y responsabilidades contraídas por , o para ellos, que puede o puede convertirse en un gravamen, cargo o gravamen contra la Propiedad, antes de que dicha deuda o responsabilidad se convierta en un gravamen, cargo o gravamen, excepto que GEGI y el Fideicomiso no necesitan descargar o liberar ningún gravamen, cargo o gravamen mientras que GEGI y el Fideicomiso lo impugnaron.

Las partes acuerdan que Bolivia será prontamente informada de la ejecución de este Contrato de Fideicomiso para que Bolivia presente de manera adecuada y oportuna una Notificación de No Responsabilidad con la oficina del registrador. Nada de lo contenido en este documento se interpretará en el sentido de impedir que GEGI y el Fideicomiso cedan, pignoren, graven o transfieran de otro modo su interés en este Acuerdo, o la Propiedad, con el propósito de adquirir financiamiento para sus actividades u operaciones en la Propiedad, o para cualquier otro finalidad, cuyos actos están expresamente autorizados.

15. **Impuestos:**

15.1 **Impuestos de bienes inmuebles:** GEGI y el Fideicomiso pagarán puntualmente, antes de la morosidad, todos los impuestos y gravámenes, generales, especiales, ordinarios y extraordinarios, que puedan imponerse o evaluarse durante la vigencia del Acuerdo, y sobre la Propiedad que permanece sujeta a este Acuerdo.

. Todos los impuestos para el año en que se ejecuta este Acuerdo y para el año en que termina este Acuerdo serán prorrateados, excepto que ni Bolivia, ni GEGI y el Fideicomiso serán responsables del pago de dichos impuestos que se basan en ingreso, renta o producción de los Bienes Gravados, únicamente a la otra parte. GEGI y el Fideicomiso siempre tendrán el derecho de impugnar, ante un tribunal o de otro modo, en su propio nombre, la validez o el monto de tales impuestos o gravámenes, si considera que son ilegales, injustos, desiguales o excesivos, o para dar esos otros pasos, o procedimientos que considere necesarios para asegurar una cancelación, reducción, reajuste o nivelación de la misma antes de que venza su pago. GEGI y el Fideicomiso, previa solicitud, proporcionarán a Bolivia copias de recibos o comprobantes de pago de todos los impuestos y gravámenes, cuando se paguen.

15.2    **Impuestos a la propiedad personal:** GEGI y el Fideicomiso pagarán todos los impuestos gravados sobre los bienes muebles, mejoras o estructuras colocadas o utilizadas en la Propiedad.

15.3    **Impuestos sobre la Renta:** GEGI y el Fideicomiso no serán responsables de ningún impuesto gravado o medido sobre la renta, u otros impuestos aplicables a Bolivia, con base en los pagos en virtud de este Acuerdo, o con base en la producción de Minerales, Mena o Producto de la Propiedad.

15.4    **Entrega de Notificaciones Tributarias:**Si Bolivia recibe facturas o reclamos fiscales a cargo de GEGI y el Fideicomiso, Bolivia los enviará inmediatamente a GEGI y al Fideicomiso para que tome las medidas correspondientes, y si GEGI y el Fideicomiso no los recibe por lo menos diez ( 10) días hábiles antes de la fecha de vencimiento del pago, GEGI y el Fideicomiso no serán responsables de ningún interés, multa, cargo, gasto u otra responsabilidad que surja del pago atrasado. Bolivia acuerda indemnizar y eximir a Trust de todos los intereses, multas, cargos, gastos o responsabilidades en que Trust pueda incurrir, de vez en cuando, como resultado de la falta de Bolivia de remitir oportunamente las facturas de impuestos o reclamos a Trust.

16.    **Inspección:**  Bolivia, o los representantes debidamente autorizados de Bolivia, pueden ingresar a la Propiedad y las operaciones de GEGI y el Fideicomiso en cualquier momento razonable, con el propósito de realizar una inspección. Bolivia tendrá derecho a tomar muestras materiales de la Propiedad, a fin de asegurar la determinación y el pago correctos y precisos de los Ingresos Netos, pero ingresará a la Propiedad por su cuenta y riesgo, y de tal manera que no invadir, demorar o interferir sin razón con las operaciones de GEGI y el Fideicomiso. Bolivia indemnizará y mantendrá indemne a GEGI y al Fideicomiso por todos y cada uno de los daños, reclamos o demandas derivados de daños a Bolivia, a los agentes o representantes de Bolivia, o a cualquiera de ellos, en la Propiedad, o en los accesos a lo mismo.

17.    **Información y datos del título:** En cualquier momento durante la vigencia del presente, previa solicitud por escrito de GEGI y el Fideicomiso, Bolivia obtendrá y entregará inmediatamente a GEGI y al Fideicomiso copias de todos los documentos de título que afecten la Propiedad que Bolivia tiene en su poder, o en su disposición de posesión, incluyendo copias de los planos y notas de campo topográficas de la Propiedad. Bolivia se compromete a poner a disposición de GEGI y del Fideicomiso, copias de todos los datos de exploración, pruebas, registros, mapas, estudios e informes geológicos, geoquímicos y geofísicos que Bolivia tenga en su poder, sin costo alguno.

18.    **Representación del Título:**



**18.1   Reclamos mineros no patentados:** Con respecto a la Propiedad, Bolivia por el presente acuerda, representa y garantiza, tales representaciones y garantías que sobrevivirán a la terminación de este Acuerdo, que: (a) Bolivia tiene el título supremo de los intereses de propiedad legales y equitativos plenos e indivisos en la Propiedad ; (b) Bolivia tiene pleno derecho y pleno poder para transmitir los intereses descritos en este Acuerdo; © La propiedad está libre de todo gravamen, reclamación y gravamen, excepto los que se disponga lo contrario en este Acuerdo; (d) Bolivia no cometerá acto o actos que graven o causen o causen la imposición de un gravamen sobre la Propiedad.

**18.2   Custodia de patentes pendientes y en disputa:**En cualquier momento mientras este Acuerdo esté en vigor y efecto, y un tercero haga valer un derecho de propiedad sobre la Propiedad, o Minerales, que es adverso a los intereses de Bolivia, o si GEGI y el Fideicomiso son informados por un asesor legal de GEGI y el Fideicomiso que parece que un tercero puede tener tal reclamo, GEGI y el Fideicomiso pueden depositar cualquier pago que de otro modo se adeudaría a Bolivia en virtud del presente en depósito, y dar aviso de dicho depósito a Bolivia. En el caso de una disputa sobre la titularidad de la Propiedad, los Minerales, la superficie en acres de la Propiedad o los Ingresos netos, el pago de los Ingresos netos puede aplazarse hasta veinte (20) días después de que GEGI y el Fideicomiso presenten evidencia de que tal disputa ha sido resuelta. Quedando finalmente liquidado, y todas las disposiciones para mantener este Acuerdo en vigor se relacionarán con dicho plazo extendido para el pago.

**19.   Modificación y Reubicación de Concesiones:**GEGI y el Fideicomiso tendrán el derecho para enmendar o reubicar, en nombre del Joint Venture, cualquiera de los Proyectos Mineros no patentados  Concesiones sujetas a este Contrato, que GEGI y el Fideicomiso consideren conveniente modificar o reubicar. Bolivia designa a GEGI y al Fideicomiso como representante legal de Bolivia a los efectos de ubicar, modificar o reubicar dichas reclamaciones. Todas las ubicaciones modificadas o nuevas pasarán a formar parte de los Reclamos Mineros sujetos a este Acuerdo, y las partes inmediatamente, luego de la modificación o ubicación de dichos reclamos, ejecutarán y entregarán un anexo a este Acuerdo, y un memorando enmendado a este Acuerdo, para que efecto.

**20.   Acuerdo, Garantías y Representaciones:**Cada una de las partes se compromete, garantiza y declara por sí misma lo siguiente:

**20.1   De acuerdo con las leyes:**Que ha cumplido con todas las leyes y regulaciones aplicables de cualquier agencia gubernamental, con respecto a los términos de este Acuerdo y su ejecución.

**20.2   Ausencia de Procedimientos Pendientes:**Que no hay demandas o procedimientos pendientes o amenazados que afecten su capacidad para cumplir con los términos de este Acuerdo.

**20.3   Autoridad:**Que tiene pleno derecho, título y autoridad para participar en este Acuerdo y cumplirlo, de conformidad con sus términos. Ni este Acuerdo, ni su ejecución, viola o constituye un incumplimiento de las disposiciones de cualquier otro acuerdo, del cual usted sea parte.

**20.4   Tarifas del buscador de comisiones:**Que no ha utilizado los servicios de un corredor o buscador en la negociación y/o ejecución de este Acuerdo, y que no ha incurrido en ninguna obligación de pagar una comisión de corredor o una tarifa de buscador al momento de la ejecución y consumación del contrato. mismo.

**20.5    Costos:**Que usted pagará todos los costos y gastos incurridos o por incurrir en la negociación y preparación de este Acuerdo, y en el cierre y realización de las transacciones contempladas en este Acuerdo.

**21.    Acuerdos, Representaciones y Garantías de Bolivia:**Bolivia se compromete, representa y garantiza lo siguiente:

**21.1    No interferencia:**Bolivia por la presente se compromete a que Bolivia no realizará, ni permitirá que se realice, ningún acto que pueda, o pueda obstaculizar o menoscabar los derechos de GEGI y el Fideicomiso para ejercer cualquier derecho otorgado a GEGI y al Fideicomiso, en virtud de este Acuerdo, o a adquirir todos los derechos, títulos e intereses, en y para la Propiedad de bienes inmuebles. Cabe aclarar que la propiedad de las redes de litio son exclusivas del Estado Plurinacional de Bolivia.

**21.2    Certificado de impedimento:**A solicitud por escrito de GEGI y el Fideicomiso, y siempre que GEGI y el Fideicomiso no infrinjan este Acuerdo, Bolivia ejecutará y entregará a GEGI y al Fideicomiso un certificado de impedimento legal, en una forma aceptable para GEGI y el Fideicomiso, mediante el cual Bolivia confirma que el Acuerdo está en pleno vigor y efecto, y que no hay incumplimientos por parte de Bolivia, o GEGI y el Fideicomiso, en virtud del Acuerdo.

**21.3    Condiciones ambientales:** Bolivia no tiene conocimiento, ni ha recibido notificación de ninguna agencia gubernamental, de ninguna condición existente en la Propiedad, o creada por Bolivia, que sea o pueda estar en violación de cualquier ley, reglamento u ordenanza aplicable.

**22.    Terminación por Bolivia:** En caso de incumplimiento, o incumplimiento por parte de GEGI y el Fideicomiso, de cualquiera de los pactos, términos o condiciones de este Acuerdo, Bolivia tendrá derecho a notificar a GEGI y al Fideicomiso por escrito sobre el incumplimiento, especificando los detalles del mismo. Si dicho incumplimiento no se subsana dentro de los sesenta (60) días siguientes a la recepción de la notificación, siempre que razonablemente se pueda hacer lo mismo dentro de dicho plazo, o por el contrario, si GEGI y el Fideicomiso no han iniciado acciones para subsanar el mismo dentro de dicho plazo , o no después de dicho comienzo y proseguir diligentemente dicha acción hasta su finalización, este Acuerdo se considerará cancelado y rescindido a partir del sexagésimo sexagésimo día después de la recepción de la notificación.

La rescisión no se basará en el incumplimiento o la falta de remedio del mismo, que resulte de cualquier causa más allá del control razonable de GEGI y el Fideicomiso, incluidas, entre otras, las disposiciones de Fuerza Mayor de este Acuerdo. Si el desempeño de GEGI y el Fideicomiso es incompleto en ese momento, GEGI y el Fideicomiso tomarán con diligencia los pasos necesarios para completar el desempeño. Sin embargo, Bolivia, a su sola discreción y previo aviso a GEGI y al Fideicomiso, puede optar por tomar posesión y propiedad de cualquier bien mueble, equipo, accesorios, edificios, estructuras, mejoras, Mena y Minerales que se encuentren en la Propiedad, y GEGI y se considerará que el Fideicomiso, según los términos de este Acuerdo, pierde el título de todo lo anterior.

En el momento de la elección de Bolivia para tomar posesión, todos los bienes muebles, equipos, accesorios, edificios, estructuras y mejoras serán abandonados y dejados por GEGI y el Fideicomiso en buen estado.

**23.    Fin de los términos:** GEGI y el Fideicomiso tendrán seis (6) meses después de la terminación de este Acuerdo, y cualquier prórroga del mismo, para retirar de la Propiedad todos los edificios, estructuras y equipos, y restaurar, o actuar diligentemente para



restaurar la Propiedad a un estado ambientalmente aceptable. estatal, según lo requieran las autoridades de Bolivia, MHE, VMATE, YLB, Departamento de Potosí y/o Municipio de Uyuni. A discreción exclusiva de Bolivia, Bolivia puede, previa notificación a GEGI y al Fideicomiso, exigir a GEGI y al Fideicomiso que abandonen, entreguen y den posesión a Bolivia de cualquier edificio, estructura, instalación o equipo, incluidos los bienes muebles, que se encuentren en el Bienes, antes de la rescisión, cuya propiedad se considerará propiedad de Bolivia, sin más acción de parte de las partes.

24. **Terminación:** GEGI y el Fideicomiso pueden, en cualquier momento, rescindir este Acuerdo mediante notificación por escrito a Bolivia. En el momento o inmediatamente después de la notificación de entrega de terminación, el Licenciatario ejecutará y entregará a Bolivia una liberación por escrito de este Acuerdo, en forma adecuada, para registro. Si GEGI y el Fideicomiso rescinden este Acuerdo, GEGI y el Fideicomiso no estarán obligados a cumplir ninguna obligación ni a pagar los Ingresos netos que se acumulen o vengan después de la fecha de terminación, que será la fecha en que la notificación del Fideicomiso entre en vigencia, de acuerdo con los términos de este acuerdo. Al vencimiento, rescisión o entrega de este Acuerdo, GEGI y el Fideicomiso devolverán la Propiedad, o cualquier parte de la Propiedad entregada, en un estado que cumpla con las leyes, los reglamentos aplicables y las ordenanzas de cualquier agencia gubernamental o autoridad que tenga jurisdicción sobre la Propiedad.

25 **Datos:** A la terminación de este Acuerdo, Bolivia tendrá derecho a solicitar una copia de todos los datos fácticos no interpretativos con respecto a GEGI y los Bienes del Fideicomiso, en posesión al momento de la terminación. GEGI y el Fideicomiso acuerdan que, dentro de los treinta (30) días posteriores a la recepción de una solicitud oportuna por escrito de Bolivia, proporcionará a Bolivia una copia de todos los datos fácticos no interpretativos. GEGI y el Fideicomiso no tendrán ninguna responsabilidad por la información recibida o por la que Bolivia o cualquier otra parte a la que Bolivia proporcione dicha información. Bolivia ejercerá su derecho a solicitar la información a que se refiere el presente, por escrito, y deberá presentar dicha solicitud por escrito dentro de los treinta (30) días siguientes a la terminación de este Acuerdo. En ausencia de dicha solicitud oportuna por escrito, GEGI y el Fideicomiso no tendrán ninguna obligación bajo esta Sección de proporcionar dicha información a Bolivia o al MHE, VMATE, YLB y Departamento de Potosí, Municipio de Uyuni. Bolivia acuerda, con respecto a cualquier anuncio público, excepto por las excepciones establecidas en la oración anterior, incluido el anuncio de la ejecución de este Acuerdo, si lo hubiere, a informar a Trust del contenido del anuncio o divulgación antes de su intención de hacer dicho anuncio, con tiempo suficiente para permitir que GEGI y el Fideicomiso hagan en forma conjunta o simultánea un anuncio público o divulgación similar, si la otra parte así lo desea, excepto en el caso de que cualquiera de las partes anticipe vender o ceder total o parcialmente de su interés o negociaciones para obtener préstamos de terceros, dicha parte tendrá derecho a proporcionar información a la parte a la que se pretende realizar dicha transferencia o cesión, o con la que se llevan a cabo dichas transacciones, al obtener de dicha parte un acuerdo para mantener la confidencialidad de la información así proporcionada. Nada en este Acuerdo limitará o restringirá el derecho de GEGI y el Fideicomiso de proporcionar, entregar o divulgar a empresas matrices, empresas con una matriz común, empresas subsidiarias, empresas afiliadas o relacionadas y/o copartícipes los datos y la información, incluidos los términos de este Acuerdo, entrando en posesión de GEGI y el Fideicomiso, en virtud de este Acuerdo, al obtener de dicha parte un acuerdo para mantener confidencial cualquier información así proporcionada.

26. **Confidencialidad:** Los datos y la información, incluidos los términos de este Acuerdo, que entren en posesión de Bolivia, en virtud de este Acuerdo, se considerarán confidenciales y no se divulgarán a terceros externos, excepto cuando sea necesario para el registro público o para proteger el título. de la Propiedad, o para anunciar y divulgar públicamente información bajo las leyes y reglamentos de Bolivia, o el MHE, VMATE,

YLB, y Departamento de Potosí, Municipio de Uyuni. Bolivia acuerda, con respecto a cualquier anuncio público, excepto por las excepciones establecidas en la oración anterior, incluido el anuncio de la ejecución de este Acuerdo, si lo hubiere, a informar a Trust del contenido del anuncio o divulgación antes de su intención de hacer dicho anuncio, con tiempo suficiente para permitir que GEGI y el Fideicomiso en conjunto, o simultáneamente hacer un anuncio público o divulgación similar, si la otra parte así lo desea, excepto que en el caso de que cualquiera de las partes prevea vender, o ceder todo o parte de su interés, o negociaciones para obtener préstamos de terceros, dicha parte tendrá derecho a proporcionar información a la parte a la que se pretenda realizar dicha transferencia o cesión, o con la que se lleven a cabo dichas negociaciones, obteniendo de dicha parte un acuerdo para mantener la confidencialidad de la información así proporcionada. Nada en este Acuerdo limitará o restringirá el derecho de GEGI y el Fideicomiso de proporcionar, entregar o divulgar a empresas matrices, empresas con una matriz común, empresas subsidiarias, empresas afiliadas o relacionadas y/o co-socios los datos y la información, incluida la términos de este Acuerdo.

27.    **Fuerza mayor:** Las obligaciones respectivas de cualquiera de las partes, excepto GEGI y la obligación del Fideicomiso de mantener un seguro y realizar el trabajo de avalúo anual requerido bajo este Acuerdo, se suspenderá por el tiempo y en la medida en que dicha parte no pueda cumplir, en su totalidad o en parte, por guerra o condiciones de guerra, real o potencial, terremoto, incendio, inundación, huelga, paro laboral, accidente, motín, siniestro inevitable, acto presente o futuro o restricción de cualquier autoridad legal, estatuto, regulación u ordenanza del gobierno, restricciones o condiciones ambientales, aprobaciones de permisos o licencias, caso fortuito, acto del enemigo público, retrasos en el transporte u otra causa de la misma u otra naturaleza más allá del control razonable de dicha parte.

28.    **Disputas: No Interrupción de Operaciones:** Las disputas o diferencias entre las partes no interrumpirán el cumplimiento de este Acuerdo, o las operaciones continuas de GEGI y los Fideicomisos. En el caso de cualquier disputa o diferencia, la negociación puede continuar y las liquidaciones y los pagos pueden realizarse de la misma manera que antes de dicha disputa o diferencia.

29.    **Memorando de acuerdo:** Al momento de la ejecución de este Acuerdo, las partes ejecutarán y harán que se entregue una forma abreviada de este Acuerdo, para ser archivado en las oficinas de propiedad del gobierno local donde se encuentra la totalidad o parte de la Propiedad. La celebración y registro del Memorando de Acuerdo no limitará, aumentará o afectará, de ninguna manera, ninguno de los términos de este Acuerdo, ni ningún derecho, interés u obligación de las partes.

30.    **Avisos:** Cualquier aviso requerido o autorizado por este Acuerdo se hará por escrito. Cualquier aviso requerido o autorizado por este Acuerdo puede enviarse por "entrega" registrada o certificada, franqueo prepago y acuse de recibo, o por DHL, United Parcel Service o Federal Express, dirigida a la parte correspondiente a la siguiente dirección, o la dirección que la parte haya designado a la otra parte, de conformidad con esta Sección. Se considerará que cualquier notificación requerida, o autorizada para ser dada por este Acuerdo, ha sido suficientemente dada o entregada por escrito, si se envía por correo según lo dispuesto en este documento, se entrega personalmente a la parte correspondiente o se envía por télex, telégrafo, facsímil u otro servicio alámbrico, y efectivamente recibido por dicha parte. Dicha notificación surtirá efecto en la fecha de su recepción por el destinatario.

                                                                    **La Paz, 02 de agosto de 2022**

Dr. Marcelo Gabino Gonzáles Saique,
Gerente General:
YACIMIENTOS DE LITIO BOLIVIANO

María Eugenia Celestin como
El apoderado del Trust
SINDICO, SEVERINO GARCIA SANTA ROMANA QUANTUM TRUST
161 Agua Calle Norwich, CT 06360

Ing. Julio César Medina Gamboa
RECTOR UNIVERSIDAD MAYOR DE SAN SIMON
AV. Ballivián Cochabamba

Por: _____
Mohammad Ganzefer Khan, su
Green Energy Global Inc., una
Empresa de Arizona, Corp.

**ANEXO "A"**

Que cierto Acuerdo de Joint Venture Minero entró en vigencia el 2 de agosto de 2022, por y entre el departamento boliviano de Potosí y Quantum Trust, un fideicomiso de Delaware, con domicilio en 161 Water Street, Norwich, CT 06360, y Green Energy Global Inc. ., con domicilio en 333 North Wilmot Road, Tucson, Arizona 85711.

Nombre de la Concesión Minera:

"Proyecto de Industrialización de los Recursos Evaporíticos de Bolivia" siendo todos aquellos yacimientos de litio que se encuentran en el Salar de Uyuni, en un área de aproximadamente 11098 Hectáreas, que contiene un mínimo de 9.000.000 de toneladas métricas de Litio.







Y, como se muestra en el mapa adjunto al presente.

## ANEXO "B"

### CÁLCULO DE INGRESOS NETOS

**Ingresos y gastos.** Los ingresos netos se calcularán deduciendo de los ingresos brutos (según se define a continuación) realizados (o considerados realizados), los costos y gastos atribuibles a la exploración, el desarrollo, la extracción, la comercialización de productos y otras operaciones que serían deducibles según los principios y prácticas de contabilidad generalmente aceptados de los Estados Unidos aplicados de manera uniforme, incluidos , sin límites:

1.      Todos los costos y gastos de reemplazo, ampliación, modificación, alteración o cambio, de tiempo en tiempo, de las instalaciones de la Minería. Los costos y gastos de mejoras (tales como vías de acarreo o instalaciones de molienda) que también se utilicen en relación con trabajos, distintos de las Propiedades, serán cargados a las Propiedades solo en la proporción que los pies usen en relación con la
Las propiedades soportan su uso total;

2.      Impuestos al valor agregado, impuestos sobre bienes inmuebles e impuestos sobre la propiedad personal no garantizada, y todos los impuestos, distintos de los impuestos sobre la renta, aplicables a la minería de las Propiedades, incluidos, entre otros, todos los impuestos sobre la minería, impuestos sobre las ventas, impuestos sobre cesantías, derechos de licencia y gravámenes gubernamentales de carácter similar. naturaleza;

3.      Una porción prorrateada de (I) los salarios y gastos de los empleados que atienden Operaciones cuyo tiempo no se asigna directamente a dichas Operaciones, y (III) los costos de mantenimiento y operación de una oficina y cualquier suboficina necesaria y (III) todos los campamentos necesarios , incluidas las instalaciones de vivienda para los empleados, utilizadas para las operaciones. El gasto de esas instalaciones, menos cualquier ingreso de las mismas, incluirá la depreciación o un alquiler mensual justo en lugar de la depreciación de la inversión;

4.      Todos los gastos incurridos en relación con la venta de Productos, incluyendo una provisión para comisiones a tarifas, que son normales y habituales en la industria.

5.      Todos los montos pagaderos al Operador durante la Minería de conformidad con cualquier acuerdo operativo aplicable o similar vigente con respecto a la misma;

6.      El costo real de la inversión bajo el Acuerdo, pero antes del comienzo de Minería, que incluirá todos los gastos de Exploración y Desarrollo de las Propiedades.

7.      Intereses sobre dinero prestado o adelantado para costos y gastos, pero en ningún caso en exceso del máximo permitido por la ley;

8.      Una provisión para capital de trabajo e inventario razonables;

9.      costos reales de operaciones; y

10.     Pagos de alquiler, regalías, producción y compra.

A los efectos del presente, el término "Ingresos brutos" incluirá la suma de (i) los ingresos brutos por la venta de Productos, menos los cargos por muestreo, análisis o sanciones; (ii) ingresos brutos por la venta u otra disposición de Activos; (iii) ganancias del seguro; (iv) indemnización por expropiación de Bienes; y (v) procede la sentencia.

Se pretende que GEGI y el Fideicomiso recuperen de los Ingresos brutos todas sus contribuciones continuas para Exploración, Desarrollo, Minería, Expansión y Modificación y mercadeo de Productos antes de que se distribuyan los Ingresos netos. No se hará deducción por impuestos sobre la renta, depreciación y amortización.



## ANEXO "C"

Quantum Trust y sus socios financiarán, con el 5% de las ganancias netas, lo siguiente:

1.  Aproximadamente Treinta Millones de Dólares de los Estados Unidos de América ($30,000,000) durante los próximos dos (2) años, para la construcción de invernaderos para el cultivo, cultivo y cosecha de hortalizas, frutas y otras actividades agrícolas.

2.  Aproximadamente Treinta Millones de Dólares Estadounidenses ($30,000,000) en las regiones rurales para la exploración, desarrollo, bombeo, tratamiento y distribución de sistemas de agua potable.

3.  La construcción de 100 a 200 aulas escolares, para los ciclos escolares 1 a 12.

4.  Aproximadamente entre cien y doscientos millones de dólares estadounidenses ($100 000 000 - $200 000 000) en mejoras de campus universitarios y becas educativas para estudiantes pobres.

5.  Aproximadamente de cien a doscientos millones de dólares estadounidenses ($100,000,000 - $200,000,000) hacia las necesidades de atención médica de los ciudadanos bolivianos, enfocándose en nuevas clínicas de salud en regiones rurales. Esto incluirá la construcción de 1 a 2 hospitales grandes en áreas de necesidad, incluida la financiación de la compra de veinte (20) helicópteros para el transporte de emergencia de pacientes a los hospitales.

Estos proyectos se financiarán con el 5% de los ingresos que se pagarán a Quantum Trust, según las instrucciones de Bolivia.



Traducido del inglés al español - www.onlinedoctranslator.com

## ANEXO AL ACUERDO DE EMPRESA CONJUNTA MINERA

Este Anexo al Acuerdo de empresa conjunta minera "Anexo" se celebra y entra en vigencia el 17 de agosto de 2022 entre Quantum Trust, SGSR, Donald Demery, Fideicomisario ("Fideicomiso") ubicado en 161 Water Street, Norwich, CT 06360, y Green Energy Global Inc., an Arizona Corporation, 333 North Wilmot Road, Tuscon, Arizona 85711 ("GEGI"), en la primera parte, y el Ministerio de Hidrocarburos y Energía del Estado Plurinacional de Bolivia MHE a través del Viceministerio de Alta Tecnologías Energéticas "VMATE" Litio, Energía Nuclear Yacimientos Bolivianos de Litio, ubicado en Avenida Mariscal Santa Cruz s/n, Edificio HANSA Piso 19, en la segunda parte. La Universidad Mayor de San Simón, Av. Ballivián esquina Reza #591 Cochabamba, Bolivia.

### CONSIDERACIONES

**ERAMOS,** The Trust, GEGI, MHE, VMATE y la Universidad celebraron un Acuerdo que entró en vigencia el 2 de agosto de 2022 y ahora desean modificar dicho Acuerdo mediante este escrito;

**POR LO TANTO**, a título oneroso, las partes acuerdan además lo siguiente:

1.      Las partes modifican la Sección 5.1 del Acuerdo para que diga:

**5.1 Pagos de regalías:**GEGI y el Fideicomiso pagarán a Bolivia el 19% de los Ingresos Brutos de GEGI y el Fideicomiso y la Universidad Mayor De San Simón el 1% de los Ingresos Brutos derivados de la venta de Minerales y Minerales extraídos de la Propiedad Minera, sean o no GEGI y el Fideicomiso ha obtenido un beneficio de ello. GEGI y el Fideicomiso pagarán regalías, al valor justo de mercado, sobre los Minerales y menas que extraiga para uso propio de GEGI y del Fideicomiso.
Dicho pago a Bolivia se hará en dinero aceptable para Bolivia, dentro de los 60 días siguientes a la entrega de los Minerales a los muelles de embarque, para su embarque.

2.      Esta enmienda al Acuerdo reemplaza la Sección 5.1, pero no modifica de otra manera cualquier otro término, pacto o condición del Acuerdo de cualquier forma o manera.

Dr. Marcelo Gabino Gonzáles Saique,
Gerente General:
CAMPOS DE LITIO BOLIVIANO

En g. Julio César Medina Gamboa
DIRECTOR
UNIVERSIDAD MAYOR DE SAN SIMÓN Av.
Ballivián Cochabamba

Maria Eugenia Celestin como apoderada
del Fideicomiso SINDICO, SEVERINO,
GARCIA SANTA ROMANA, QUANTUM
TRUST 161 Water Street Norwich, CT
06360

Green Energy Global Inc., una empresa de
Arizona, Corp.
By: _____
Muhammed Gazanfer Khan



EXHIBIT "C"

## BILL OF EXCHANGE/SECURED PROMISSORY NOTE

August 7, 2022

1.    For value received, the undersigned, **INDONG ADVANCED MATERIALS, inc.,
A Republic of Korea corporation** ("Borrower"), promises to pay to the order of **GREEN
ENERGY GLOBAL, INC.,** a California corporation ("Lender"), the principal sum of One Hundred
Million Dollars ($100,000,000.00), with no interest if paid, in full, by January 27, 2023. If not paid
in full by January 27, 2023, then interest on the unpaid balance, at the rate of Six Percent (6%) per
annum. A minimum payment of Twenty Five Million Dollars ($25,000,000) shall be due and payable
on or before January 27, 2023, the balance of principal, and interest shall all be due July 26, 2023.
Payment shall be made at Lender's principle place of business, 1801 Fairgreen Drive Full;erton,
California 92833, or as otherwise directed by Lender.

2.    All capitalized terms used in this Note, unless otherwise defined, will have the
respective meaning specified in the Security and Pledge Agreement, and Guarantee, entered into
between Borrower and Lender, all dated as of the date of this Secured Promissory Note ("Loan
Documents"). In addition, as used in this Secured Promissory Note, the following terms will have
the following meanings:

"**Business Day**" means any day other than Saturday, Sunday, or public holiday or the
equivalent for banks generally under the laws of California. Whenever any payment to be made
under this Secured Promissory Note is stated to be due on a day other than a Business Day, that
payment may be made on the next succeeding Business Day, and the extension of time will in that
case be included in the computation of payment of interest. However, if the extension would cause
the payment to be made in a new calendar month, that payment will be made on the next preceding
Business Day, and interest will be payable for the shorter period.

"**Installment Deferral Date**" shall mean the date to which payments are deferred.

"**Loan Documents**" will mean the Mining License Agreement, dated July 27, 2022, and the
Addendum of August 7, 2022, the Security and Pledge Agreement, the Shareholders Voting
Agreement, the Guarantee, and this Secured Promissory Note.

"**Maturity Date**" means the twenty seventh day of July 2022, or any earlier date on which
the indebtedness evidenced by this Secured Promissory Note is due pursuant to the terms of any of
the Loan Documents.

"**Note**" means this Bill of Exchange/Secured Promissory Note.

3.    The Note will be interest free for the period of July 27, 2022 through January 27, 2023, with
interest then accumulating on the principal balance remaining, until the principal balance is paid in
full. A principal payment in the amount of Twenty-Five Million Dollars ($25,000,000) is due

SPN01KIN01.K00                                          1

January 27, 2023, with the balance of principal and interest all due on July 26, 2023.

4.      Both principal and interest are payable in lawful money of the United States of America, at any place that Lender or the legal holder of this Note may, from time to time, in writing designate. Should Borrower not make payments of installments within five (5) days of when due, then Borrower will pay a penalty of Ten Percent (10%) of the installment. Borrower agrees that the late charge represents a fair and reasonable estimate of costs Lender will incur because of late payment by Borrower.

5.      Lender may transfer this Note, and deliver to the transferee all, or any part of the Property then held by Lender as security under this Note, and the transferee will then become vested with all the powers and rights given to Lender, and Lender will then be forever relieved from any liability or responsibility in the matter, but Lender will retain all rights, and powers given by this Note, with respect to property not transferred.

6.      Time is of the essence. It will be a default under this Note if Borrower fails to pay when due any sum payable under this Note, or to perform any obligation due Lender under the Loan Documents. On the occurrence of a default under this Note, or on the occurrence of any Event of Default under any of the Loan Documents or on the occurrence of any other event that under the terms of the Loan Documents give rise to the right to accelerate the balance of the indebtedness due hereunder, then, at that option of Lender, this Note, or any notes or other instruments that may be taken in renewal, or extension of all or any part of the indebtedness, will immediately become due without any further presentment, demand, protest, or notice of any kind. After that, interest on the outstanding principal balance under this Note will continue to accrue at the rate of 10%. Borrowers agree that this Note will be deemed to have been made under and will be governed by the laws of California in all respects, including matters of construction, validity, and performance, and that none of its terms or provisions may be waived, altered, modified, or amended except as Lender may consent to in a writing duly signed by Lender or its authorized agents. The forum for any dispute arising out of this agreement will be in the State of California, and venued in Sacramento County, California.

7.      This Note is secured, among other security, by security instruments covering personal property of the undersigned including, without limitation, the Pledge Agreement of the same date as this Note ("Pledge Agreement"), executed by the undersigned, in favor of Lender. This Note is the Note and/or Promissory Note referred to in the Loan Documents, and is entitled to the benefits of the Loan Documents that contain, among other things, provisions for acceleration of the maturity of this Note on the happening of certain stated events.

8.      If, from any circumstance, fulfillment of any provision of this Note or the Loan Documents, at the time performance or the provision is due, is prohibited by law, then the obligation to be fulfilled will be reduced to the maximum rate not so prohibited, and if from any circumstance Lender should ever receive as interest under this Note an amount that would exceed the highest lawful rate, the amount that would be excessive interest will be applied to the reduction of the

SPN01KIN01.K00                                2

principal of this Note and not to the payment of interest. This provision will control every other provision of all agreements between Borrowers and Lender with respect to the Loan.

9.     In the event of Borrowers' default hereunder, the undersigned agrees to pay all costs including, without limitation, attorney fees, incurred by the holder of this Note in enforcing payment, whether or not suit is filed, or in any suit, arbitration, mediation or other proceeding for an action on, arising out of, or related to this Note and/or the Loan Documents. This includes, without limitation, all costs, attorney fees, and expenses incurred by the holder of this Note in connection with any bankruptcy, reorganization, arrangement, or other similar proceedings involving the undersigned that in any way affects the exercise by the holder of this Note of its rights and remedies under this Note. All costs incurred by the holder of this Note in any action undertaken to obtain relief from the stay of bankruptcy statutes are specifically included in those costs and expenses to be paid by the undersigned. Borrowers will pay to Lender all attorney fees and other costs referred to in this Paragraph 9 on demand, together with interest from the date of the demand until paid. Should Lender default hereunder, or breach this Agreement, then these provisions of this paragraph are reciprocal.

10.    No delay or omission of Lender in exercising any right or power arising in connection with any default will be construed as a waiver, or as an acquiescence, nor will any single or partial exercise preclude any further exercise. Lender may waive any of the conditions in this Note, and no waiver will be deemed to be a waiver of Lender's rights under this Note, but rather will be deemed to have been made in pursuance of this Note, and not in modification. No waiver of any default will be construed to be a waiver of, or acquiescence in, or consent to any preceding, or subsequent default.

11.    If any one or more of the provisions in this Note is held to be invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction, the validity, legality, and enforce ability of the remaining provisions will not run in any way be affected or impaired. This Note will be biding on, and inure to the benefit of Borrowers, Lender, and their respective successors and assigns.

12.    This Note may only be paid early, at any time, without penalty therefore.

IN WITNESS WHEREOF, the undersigned has caused this Promissory Note to be executed as of the date and year first above written.

"BORROWER"
Indong Advanced Materials Inc., a
Republic of Korea corporation

Sang Woon Yoo

SPN01KIN01.K00                                          3

# EXHIBIT "D"



# AMENDMENT AND SUBSTITUTION OF PARTIES
# TO THE MINING LICENSING AGREEMENT

We, the undersigned parties, enter this Amendment to, and Substitution of Parties to the Mining Licensing Agreement ("Amendment"), this 8th day of August 2022, by and between Green Energy Global Inc., an Arizona corporation, ("GEGI") found at 901 N. Haskell Ave. Wilcox, Az 85643, GEC-X Explorations Inc., a Delaware corporation ("GEC"), found at 2448 East 81st Street, Suite 445, Tulsa, Oklahoma 74137, and the Quantum Trust, SGSR, Donald Demery, and trustee ("Trust"), found at 161 Water Street, Norwich, CT 06360 and Indong Advanced Materials, Inc., a Republic of Korea corporation, ("Indong"), found at 54 Gajangsaneopseo-ro, Osan-si, Gyeonggi-do, Korea.

**WHEREAS,** on or about July 27, 2022, GEGI, and Indong executed the Mining Licensing Agreement, the Parties attaching a true and correct copy hereto as Exhibit "A";

**WHEREAS,** the Bolivian State required of the contracting party proof of funds proving its financial capability to mine lithium, and because Donald Demery, as trustee of the Quantum Trust SGSR ("Trust"), provided the proof of funds, instead of GEC, the Bolivian State required the Trust to be the party to the mining contract with it, instead of GEC;

**WHEREAS,** on or about August 2, 2022, the Yacimientos de Litio Bolivianos Corporation, and Universidad Mayor De San Simon (collectively the "Bolivian State"), at 161 Water Street, Norwich, CT 06360, executed an agreement with the Trust, for the mining of minerals within the Bolivian State;

**WHEREAS,** the Mining Licensing Agreement was in error, in its division of Net Revenues between GEGI and GEC, (now the Trust), and this Amendment will serve to correct that error.

**NOW THEREFORE,** to correct the errors made in the Mining Licensing Agreement, in naming the contracting Parties, and in the division of Net Revenues paid, Indong, GEC, the Trust, and GEGI (collectively the "Parties"), agree as follows:

1.     The recitals herein above are hereby incorporated as conditions, covenants, representations, and/or warranties of this Amendment, as may be.

2.     The Mining Licensing Agreement, wherever the name "GEC Explorations Inc., a Delaware corporation," appears therein, to substitute therefore, and read the "Quantum Trust, SGSR, Donald Demery, Trustee" ("Trust").

3.     The Mining Licensing Agreement, wherever the name "GEC" appears therein to substitute therefore, and read "Trust."

4.     The Trust hereby agrees to stand in the shoes of GEC, and to assume, undertake and perform

Page 1 of 3





fall the conditions, covenants, and warrantees, GEC was to perform thereunder, and GEGI, and Indong with this, agree to accept such substitution of parties.

5.      Trust and GEGI hereby amend section 5.4 Net Revenues, to provide that Trust and GEGI will each receive 19% of the Net Revenues.

6.      The Trust, GEC, and Indong hereby amend the Mining Licensing Agreement signature blocks to be consonant with the signature blocks after this scribed.

7.      The terms set forth herein shall supercede the terms of the Mining Licensing Agreement, where in conflict with it. All other terms of the Mining Licensing Agreement not in conflict with this Amendment to Mining Agreement, shall remain in full force and effect.

8.      Section 30, of the Mining License Agreement, is hereby amended to delete the notice requirement to GEC and to substitute therefore the Trust at the address written herein above.

9.      The Trust's signature hereon shall constitute, and be the same as if it were placed and scribed on the Mining Licensing Agreement, as a counterpart thereto, under Section 34 thereof, as well as on this Amendment, and shall be effective as of July 27, 2022.

### LICENSOR:

**QUANTUM TRUST, SGSR,**

**GEC EXPLORATIONS INC., A
DELAWARE CORPORATION**

By: _____
**DONALD DEMERY, TRUSTEE**

By: _____
**DONALD DEMERY, PRESIDENT**

### LICENSEE:

**INDONG ADVANCED MATERIALS, INC.,**
a Republic of Korea corporation

By: _____
**SUNG WOON YOO, CHAIRMAN**

**OFFICIAL**
Date: July 27, 2022

**FACILITATOR:**

**GREEN ENERGY GLOBAL INC., an
Arizona, corporation**

By:_____
    **MOHAMMAD G. KHAN, PRESIDENT**

Page 3 of 3



# EXHIBIT "E"

# ADDENDUM TO
# MINING LICENCING AGREEMENT

This Addendum to Mining Licensing Agreement ("2nd Addendum") is made and entered into this 21st day of August, 2022, by and between Green Energy Global Inc., an Arizona corporation ("GEGI"), found at 901 N. Haskell Ave. Willcox, AZ 85643, the Quantum Trust SGSR, a Delaware Statutory Trust, of 290 State Street, New London, CT 06320 ("Trust"), and Indong Advanced Materials, Inc., a Republic of Korea corporation, ("Indong") found at 54 Gajangsaneopseo-ro, Osan-si, Gyeonggi-do, Korea, (collectively "Parties").

## RECITALS

**WHEREAS**, on or about July 27, 2022, GEGI, GEC Explorations Inc., a Delaware corporation, found at 2448 East 81st Street, Suite 445, Tulsa, Oklahoma 74137, ("GEC"), and Indong entered the Mining License Agreement;

**WHEREAS**, on August, 8th GEGI, GEC, and Indong entered into an Addendum to Mining License Agreement, whereby GEGI, GEC, and Indong agreed to substitute for GEC, in its place and steed, the Quantum Trust SGSR, a Delaware Statutory Trust, of 290 State Street, New London, CT 06320 ("Trust"), the parties now being GEGI, Indong, and the Trust (collectively "Parties");

**WHEREAS**, the Parties now desire to Amend the Mining License Agreement, at paragraph 5, as follows below.

**WHEREAS**, The Parties now desire to amend Exhibit A. Where Indong Inc will be entitled to total of (1,215,000 MT ) of the lithium Extraction.

**NOWTHEREFORE**, the Parties hereto agree as follows:

1.    **Recitals:** The Parties hereto incorporate the Recitals set forth herein above as though fully set forth hereat as terms, or conditions as the case may be.

2.    **Amendment to Mining License Agreement:** The Parties hereby amend the Mining License Agreement by substituting for paragraph 5 thereof, the following paragraph 5, as thouh fully set forth therein, in place of paragraph 5 thereof:

5.    **Payments:** Licensee shall make the following payments:

5.1    *Finders Fees.* Upon signing the Mining License Agreement, the Licensees shall immediately wire transfer to the account of GEGI, at Wells Fargo Bank the sum of Two Million US Dollars ($2,000,000). Thereafter, immediately following the execution of the 2nd Addendum to the Mining License Agreement, the Licensee shall immediately wire transfer to the attorney-client trust account of Peterson & Kell, ALC, at US Bank, the additional sum of Five Million US Dollars ($8,000,000).

5.2    **One Time Fee.** Seven days after the execution of the 2nd Addendum




to the Mining License Agreement, the Licensee, in part consideration thereof, shall execute a document promising to pay Licensor One Hundred Million Dollars ($100,000,000), US dollars, which sum shall bear interest for six months thereafter at the rate of 1%, per annum ("Debt"). The Debt shall be reduced at the end of six months by the amount of twenty-five million dollars ($25,000,000) US, and shall thereafter bear interest at the rate of 6% per annum, all due, and payable, within one year. In the event of default the Debt will bear interest at 10%, compounded annually. The Debt will have a provision for attorney fees and arbitration, in California, applying California law, and an award of attorney fees, and costs, for its collection, and anti dilution provisions of its pledged assets. The Debt will be secured by the pledge of Chairman Sung Woon Yoo, of his shares of Indong Advanced Materials, Inc., a Republic of Korea corporation, ("Indong") Eurocell, Inc., a Republic of Korea corporation ("Eurocell"), and FIC Advanced Materials Inc., ("FIC"), purusant to a pledge agreement to be executed concurrent with the Debt instrument, and will grant a secured interest in additional assets, in that amount necessary to fully secure the Debt.

    5.3    **Royalty Payments.**

| | | |
|---|---|---|
| 5.3.1 | **MHE/VMATE.** | 20.00% |
| 5.3.2 | **INDIGENOUS** | 5.00% |
| 5.3.2 | **GEGI** | 7.50% |

GEGI's Royalty calculation will be based on the greater of $75,000 per metric ton or the London Metal Exchange's fair market price average over the quarter.

    5.4    **Net Revenues.** Net Revenues are to be paid quarterly, as computed according to Exhibit "A", and distributed to the entities set forth herein below, in the percentages of Net Revenue amounts, as follows:

| | | |
|---|---|---|
| 5.4.1 | **Licensee** | 60% |
| 5.4.2 | **TRUST** | 18% |
| 5.4.3 | **GEGI** | 20% |
| 5.4.4 | **Indigenous** | 2% |

3.    The terms set forth herein shall supercede the terms of the Mining Licensing Agreement, where in conflict with it. All other terms of the Mining Licensing Agreement not in conflict with this Amendment to Mining Agreement, shall remain in full force and effect.

4.    The Trust's signature hereon shall constitute, and be the same as if it were placed and scribed on the Mining Licensing Agreement, as a counterpart thereto, under Section 34 thereof, as well as on this Amendment, and shall be effective as of July 27, 2022.





**LICENSORS:**

GREEN ENERGY GLOBAL INC., an
Arizona, corporation

By: _____   08/21/22
MOHAMMAD G. KHAN, PRESIDENT

Quantum Trust, a
Delaware Statutory Trust,

By: _____   Date: 08/21/22
Maria Eugenia Celestin, Attorney in Fact

**LICENSEE:**

INDONG ADVANCED MATERIALS, INC.,
a Republic of Korea corporation

By: _____   09/05/22
SUNG WOON YOO, CHAIRMAN

# EXHIBIT "F"



## COMUNICADO

Yacimientos de Litio Bolivianos (YLB) aclara a la opinión pública que, como empresa estratégica del Estado, no tiene acuerdos suscritos de otorgación de derechos de extracción de litio en los salares bolivianos con ninguna empresa extranjera.

La versión que indica que un consorcio empresarial coreano-estadounidense ganó los derechos de extracción de litio en Bolivia para adquirir nueve millones de toneladas del metal en el Salar de Uyuni es falsa y carece de fuente confiable.

La Paz, noviembre de 2022